### Richmond

EARL WASHINGTON, JR.

V.

COMMONWEALTH OF VIRGINIA

Record No. 840776.

November 30, 1984.

Present: All the Justices.

538

*John W. Scott, Jr.; Gary A. Hicks (Hill, Tucker & Marsh*, on briefs), for appellant.

*Linwood T. Wells, Jr., Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

In a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, Earl Washington, Jr.,[1] was convicted of the capital murder of Rebecca Lynn Williams, having killed her with premeditation subsequent to the commission of rape, Code § 18.2-31(e), and his punishment was fixed at death. After a sentencing hearing in which the probation officer's report was considered, the court, on March 20, 1984, entered a final order imposing the death sentence. The defendant's appeal raises questions concern-

---

[1] The defendant is also known as Earl Junior Washington, and was so indicted.

ing pretrial publicity, the voluntariness of his confession, and the admissibility of certain evidence. It has been consolidated with an automatic review of his death sentence and given priority on our docket.

Rebecca Lynn Williams, at the time of her death, was 19 years of age. She had been married while very young and lived with her husband and three children in a ground-floor unit of the Village Square Apartments in the Town of Culpeper. That development adjoins Route 29, from which it is separated by a wire fence.

Shortly before 11:00 a.m. on June 4, 1982, a neighbor saw Rebecca Williams walking toward her apartment with her two younger children, a two-year-old and an eight-month infant in a stroller. Her eldest child was in school, and her husband was at work. Between 11:00 a.m. and noon, another neighbor saw a black man climbing the Route 29 right-of-way fence near the Williams' apartment. Just before noon, Officer J. L. Jackson, a Culpeper policeman who lived in Village Square, saw some people running near the partially opened door of the Williams' apartment, trying to "get somebody else's attention that something was wrong." He saw someone lying in the open door and went to investigate.

Officer Jackson found Rebecca Williams lying partly out of the door, nude, and bleeding from numerous stab wounds. She was screaming, "help me, help me . . . he hurt me, he hurt me." She told Jackson she had been raped. A neighbor covered her with a sheet, and Jackson went inside to retrieve the two small children. The assailant had evidently left the scene and nobody else was present. Bloodstains smeared the walls of a rear bedroom and were in evidence on the bed and floors. Before she was placed in an ambulance, Mrs. Williams told another policeman that her attacker was a black man acting alone and that he was a stranger to her. She was still conscious, pleading for help, and saying that she didn't want to die.

Clifford Williams, the victim's husband, and the couple's eldest daughter, arrived on the scene before the ambulance came. Rebecca told Clifford that her assailant had been a black man, but said little more. She was taken to Culpeper Memorial Hospital. On arrival, she had no blood pressure and was unresponsive. Copious amounts of blood and air were escaping from a wound in the right chest. She underwent emergency surgery to stop her internal bleeding, but it was unsuccessful. She was pronounced dead at 2:05 p.m.

An autopsy was conducted by Dr. James C. Beyer, Deputy Chief Medical Examiner. It disclosed that Rebecca Williams had died as a result of 38 stab wounds to the neck, chest, and abdomen, both front and back. Of these, 14 had penetrated internal organs and each of them alone could have caused death if untreated. Vaginal smears were positive for the presence of sperm and male prostatic enzyme. The distribution of the secretions and the relatively intact condition of the sperm led Dr. Beyer to the conclusion that intercourse had occurred one to twelve hours before death and subsequent to any bath or shower by the victim. Clifford Williams testified that his wife invariably bathed daily and that the couple had not had sexual relations since the Tuesday before the Friday she died.

The crime remained unsolved for nearly a year. About a week after his wife's death, Clifford Williams moved some furniture from his apartment to that of his parents. Included was a dresser from the bedroom in which the assault had occurred. Unnoticed by Clifford, a partly opened drawer contained a shirt which did not fit him. It bore some small bloodstains. Clifford's father wore it once to repair a truck, but Mrs. Williams, Sr., washed it and later asked Clifford if it were his. When he was unable to identify it, she turned it over to the police.

The defendant is a black male, 23 years of age, who lived with his sister at Bealeton, in Fauquier County, and worked as a farm laborer. On May 21, 1983, he was arrested in Fauquier County on unrelated charges at about 3:00 a.m. He testified that he had been up all night and that prior to his arrest he had been "running through the woods." After breakfast had been brought to the defendant, Fauquier County Deputy Sheriff Terry Schrum interviewed him in the sheriff's office at Warrenton at 9:40 a.m. Schrum testified that he appeared to be awake and alert, with no smell of alcohol about him. He was fully dressed and did not appear to be tired or dishevelled. Another deputy read *Miranda* warnings to the defendant, who said that he understood them and agreed to talk to the deputies without a lawyer. The deputies then interviewed the defendant concerning the Fauquier charges for about two hours. The interview ended before noon and lunch was brought to the defendant.

At 12:40 p.m., the defendant sent word to the Fauquier deputies that he wanted to talk to them again. They took him to an office in the sheriff's department and asked him if he wished to

speak to them. He said that he did. They gave him *Miranda* warnings again and told him that they wanted to talk to him about an incident in which a girl had been stabbed in Culpeper. He was visibly nervous and shaking and began to cry. After a few minutes he described the victim and said he had "stuck her with a knife a few times." He said that after the assault he had gone back out to the highway and hitchhiked north. He told the deputies that a white man had given him a ride and that he had thrown the knife out of the car along the way toward Remington. He said that "it had been eating out his insides" and that he felt better after admitting it. He made no mention of rape, and the deputies knew only of the murder.

Called by Deputy Schrum, Culpeper Police Lieutenant H. Lee Hart and Virginia State Police Special Agent C. Reese Wilmore arrived in Fauquier County about 3:00 p.m. on May 21. They found that the defendant had gone to sleep after Schrum's interview, so they deferred meeting him until the following morning and went back to Culpeper. They returned to Warrenton and interviewed the defendant at about 10:00 a.m. on May 22, after again reading *Miranda* warnings to him.[2] The defendant said that he understood his rights and signed a waiver form. He was hesitant in answering questions and first said that the victim was black, but later in the interview, without prompting, amended his statement to say she was white. He gave a fairly accurate description of her.

The defendant's account was that he had been given a ride from Warrenton to Culpeper by two friends who dropped him off at a parking lot near the apartment development. He saw the victim walking toward her front door, and after she went in, he followed, kicking it open. It opened easily. The woman told him to get out. He said that he then took his knife out and "stuck her one time in the stomach and I took her to the back bedroom." He said that he forced her to undress completely and had sex with her. She didn't want to do it, but he was "holding a knife on her." He said, "I stabbed her once or twice before I left the apartment." He also told the officers that he had left his shirt in the apartment because it had bloodstains on it — that he threw it into a partly opened dresser drawer and left without it. Lt. Hart happened to have in

---

[2] On this occasion, the *Miranda* warnings were shown to the defendant in written form. After "pondering over" them for a few minutes, he told the officers that he could read "some, not too well." The officers then read the form to him.

his car the shirt Mrs. Williams, Sr., had taken from the dresser and given to the police. Hart showed it to the defendant, who identified it as his by marks left by a patch on the pocket which had been ripped off.

Later that afternoon, the officers went through the interview again, writing out their questions and the defendant's responses in longhand as they were spoken. The defendant initialled each page and signed the statement at the end.

After the defendant had lunch, he agreed to show the officers the location in Culpeper where he had committed the crime. They drove him there and looked at several apartment developments, which he could not identify. Upon arriving at the Village Square apartments, he at first said they looked unfamiliar, but later identified the Williams' apartment as the crime scene. He also showed the officers the route he had travelled from Warrenton to Culpeper with his friends and the return route he had followed while hitchhiking. He showed them the area where he had thrown the knife away, but their search for it was unsuccessful. They testified that there was evidence of recent flooding there and that the vegetation was very dense.

At trial, the defendant took the stand in his own defense. He denied guilt and testified that he had not been in Culpeper on June 4, 1982. He denied having made any admissions implicating himself and said the police were all lying. He admitted signing the written statement, but said he had no recollection of its contents and that they were untrue. He denied having identified the crime scene, and denied that the shirt was his, or that he had ever identified it.

The defendant argues on appeal that the trial court erred denying his pretrial motion for change of venue. He contends that "pre-trial publicity inflamed and prejudiced the citizens of Culpeper County to such a degree that a change of venue was mandatory." At the hearing on the motion, the defendant offered 3 newspaper clippings, 8 transcripts of local radio news broadcasts, and affidavits of 11 citizens, 2 of whom opined that the defendant could not receive a fair trial in the county due to the publicity and 9 of whom stated that they would personally not be impartial. The Commonwealth responded with the affidavits of 16 citizens who were of the opinion that the defendant could receive a fair trial in the county. After reviewing this material, the court

denied the motion, but agreed to reconsider the ruling if an impartial jury should, on voir dire, prove difficult to impanel.

At trial, 39 veniremen were examined on voir dire, out of whom 26 were found free of exception, the last 6 of whom were reserved for the selection of alternate jurors. A number of those impanelled had some recollection of newspaper or radio coverage of the case, but few could recall the details and all testified to their ability to decide the case solely upon the evidence. All veniremen who expressed the slightest hesitation on this point were excused by the court, in some cases on the court's own motion, without awaiting a challenge for cause. All challenges for cause based upon bias arising from pretrial publicity were sustained. Altogether, 6 veniremen were excused for this reason out of the 39 examined. Neither the defendant nor the Commonwealth objected to any of the court's rulings in this respect, and both sides indicated their satisfaction with the panel ultimately selected.

The newspaper and radio excerpts offered by the defendant are purely factual and non-inflammatory. They are neither inaccurate nor intemperate in tone. They are not voluminous, considering the time interval between offense and trial, but even if they were so considered, mere volume of publicity is not alone sufficient to require a change of venue. *Dobbert* v. *Florida*, 432 U.S. 282, 303 (1977); *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 538, 273 S.E.2d 48, 52 (1980), *cert. denied*, 451 U.S. 1031-32 (1981).

The burden is on a defendant to demonstrate by affirmative evidence that he cannot obtain a fair trial unless a change of venue is granted. The decision is within the sound discretion of the trial court and will not be reversed unless the record affirmatively shows an abuse. *LeVasseur* v. *Commonwealth*, 225 Va. 564, 577-78, 304 S.E.2d 644, 651 (1983), *cert. denied*, 464 U.S. 1063 (1984); *Newcomer* v. *Commonwealth*, 220 Va. 64, 67, 255 S.E.2d 485, 487 (1979). This burden cannot be carried merely by a showing that the prospective jurors have been exposed to pretrial publicity, or even by a showing that the jurors may have arrived at some preconceived notion as to the guilt or innocence of the accused. It is not required that they be entirely ignorant of the facts and issues. It is sufficient if they can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Irwin* v. *Dowd*, 366 U.S. 717, 722-23 (1961).

It follows from the foregoing that the voir dire must be taken into account in deciding whether there was an abuse of discretion in refusing to change the venue. *See Wansley* v. *Commonwealth*, 210 Va. 462, 171 S.E.2d 678, *cert. denied*, 399 U.S. 931 (1970). In the case before us, the relative ease with which a jury was impanelled, free of exception by either party, strongly supports the trial court's ruling in this regard. We find no abuse of discretion in the court's refusal to change the venue.

Before trial, the defendant was examined, pursuant to Code § 19.2-169.1, at Central State Hospital to determine his competency to stand trial and assist counsel in his defense. The hospital staff reported to the court that the defendant's full-scale I.Q. was 69, a score at the "upper limits of mild mental retardation," but that he was actually functioning at a higher intellectual level called "borderline." He had a ninth grade education in the Fauquier County public schools, but had attended "special education" classes. The hospital staff was of opinion that Washington was "competent to plead and stand trial in that he does not lack substantial capacity to understand the proceedings against him or to assist in his own defense."

The defendant did not assert an insanity defense, nor did he make a contention, pursuant to Code § 19.2-169.1(E), that he was incompetent to stand trial. He did, however, move to suppress his incriminating statements on the grounds that his constitutional rights were violated when he made them because he was "functionally illiterate and does not understand the language . . . in his alleged confession," that he was "undergoing great mental anguish and physical discomfort" when it was given, and that the officers "confused the defendant with their interview techniques and, therefore, took advantage of his diminished mental capacity during the unreasonably long and wearisome interrogation shortly after his arrest."

At a pretrial hearing on the motion to suppress, the court heard the evidence of Officers Hart and Schrum, the defendant himself, and Dr. Arthur Centor, a clinical psychologist at Central State Hospital, who had personally examined the defendant and signed the report. Dr. Centor's opinion was that Washington had the capacity to understand the *Miranda* rights as they were read to him, and that he had the further capacity to make a knowing and intelligent waiver of those rights. The defendant, he said, demonstrated a basic familiarity with the workings of the criminal jus-

tice system and with its terminology. In this connection, Washington testified to two previous encounters with the criminal justice system, when he was 14 and 16 years old, respectively. He said that on each of these occasions he had been advised of his *Miranda* rights.

The court made a finding that the *Miranda* warnings had been properly given to the defendant, that he had fully understood them, that he had voluntarily and knowingly waived his constitutional rights with respect to his statements to the police, and that he was not influenced by any duress or coercion. The motion to suppress was denied.

At trial, the defendant submitted the issue of the voluntariness of his confession to the jury through an instruction dealing with the weight the confession should be given. He requested, and the court granted, an instruction telling the jury: "If you believe that Earl Washington did not freely and voluntarily give a statement to law enforcement officers concerning his alleged involvement in the rape and murder of Rebecca Williams, then you may give any such statement as much or as little credibility as you deem appropriate." The issue framed by this instruction was the only one presented to the jury in the defendant's argument on the question of guilt. The jury, having heard and observed the officers and the defendant, by its verdict resolved this issue in favor of the Commonwealth.

At the punishment stage of the trial, the defense called Dr. Centor as a witness for the purpose of showing the defendant's low level of intellectual functioning. After Dr. Centor testified substantially as he had at the hearing on the motion to suppress, the Commonwealth's Attorney cross-examined him as follows:

Q. Now Doctor, based on your intelligence testing of the defendant, does the . . . let me ask you this question, if I may. Does the defendant possess sufficient intelligence to appreciate the prohibition against murder?

Mr. Scott: Objection, your Honor.

The Court: Overruled. The question would be whether or not he would have an understanding of the nature and consequence of the act. Go ahead.

A. It's my opinion that he does have the capacity to appreciate the nature, character and consequences of his acts, and the difference between right and wrong I might add.

On appeal, the defendant argues that he received insufficient *Miranda* warnings when his statements were given to the police, that he made no waiver of his right to counsel on May 22, 1983, and that he was, in any event, incapable of making a voluntary and intelligent waiver of his constitutional rights. He also contends that the testimony of Dr. Centor as to his competency at the time of the crime was prejudicial and should have been stricken.

These contentions lack merit. The record clearly shows that *Miranda* warnings were given to Washington on at least three occasions and that he gave his questioners clear indications that he understood and waived his rights, both orally and in writing. At no time before or during his questioning did he request the assistance of counsel.[3]

Dr. Centor testified that the defendant, when asked, correctly defined the roles of judge, jury, commonwealth's attorney, defense counsel, and witnesses. He was basically familiar with pleas, plea bargaining, and the consequences of each. He demonstrated more familiarity with the criminal justice system than many intelligent laymen. Dr. Centor's expert testimony, together with the testimony of the interviewing officers and the defendant's own responses on the witness stand, was unrefuted and furnishes ample factual support for the trial court's finding of voluntariness, which we will not disturb on appeal unless plainly wrong. *Witt v. Commonwealth*, 215 Va. 670, 674-75, 212 S.E.2d 293, 297 (1975). The defendant conceded that he was not subjected to physical or psychological coercion of any kind. His only complaint was that he was tired when first interviewed. If so, he gave no outward sign of it. He went to sleep by 3:00 p.m. on May 21, and told the officers, when questioning resumed at 10:00 a.m. on May 22, that he had slept well. His relatively low intelligence and limited education were factors to be weighed, along with all surrounding circumstances, in determining whether he voluntarily and intelli-

---

[3] Schrum testified: "He was then asked if he would talk to us now without a lawyer. Again he replied yes or yes, sir." Schrum was then asked, "Specifically, do you recall him saying in response to the question as to whether or not did he want court appointed counsel 'I don't want one now.'?" Schrum replied: "No, all I can say is that what I have here, that he said he *wouldn't* talk to us without a lawyer." (Emphasis added). We conclude that either Schrum inadvertently misspoke or that the transcript contains a typographic error, because the negative is at variance with Schrum's entire testimony and, most significantly, the testimony of the defendant himself. Washington, on direct examination by his own counsel at the hearing on the motion to suppress, was asked, "Did you ask for a lawyer?" He answered, "No, sir."

gently waived his constitutional rights, and whether his confession was voluntary. *Simpson* v. *Commonwealth*, 227 Va. 557, 564, 318 S.E.2d 386, 390 (1984); *Akers* v. *Commonwealth*, 216 Va. 40, 46, 216 S.E.2d 28, 32 (1975). The entire record, however, furnishes strong factual support for the trial court's findings that the defendant made knowing and intelligent waivers and that his confession and admissions were voluntary.

The defendant argues on appeal that, after being advised of his rights three times in Fauquier County and making statements there, he was entitled to a fourth set of *Miranda* warnings before being transported to Culpeper to point out the scene of the crime he had described. If he had requested counsel or clearly indicated a desire to speak no further without counsel, the officers' duty would have been to suspend further interrogation. *Edwards* v. *Arizona*, 451 U.S. 477 (1981). But this was not the case. The defendant accompanied the officers to Culpeper voluntarily, and his cooperation continued ungrudgingly.

We have considered, as have many other courts, varying circumstances in which criminal defendants have claimed that *Miranda* warnings should have been renewed after an interruption in a custodial interrogation, even though a valid waiver was initially given. *Bunch* v. *Commonwealth*, 225 Va. 423, 432-35, 304 S.E.2d 271, 275-77 (1983); *Simmons* v. *Commonwealth*, 225 Va. 111, 120-21, 300 S.E.2d 918, 922-23 (1983); *McFadden* v. *Commonwealth*, 225 Va. 103, 109-10, 300 S.E.2d 924, 927-28 (1983). In such a case, the ultimate question is whether the defendant made a "knowing and intelligent relinquishment or abandonment of his rights," a question to be determined by the "totality of the circumstances." *Wyrick* v. *Fields*, 459 U.S. 42 (1982). Where there is no evidence that the defendant had revoked a valid waiver after giving it, most courts considering the question have held, based upon the circumstances of the case, that the waiver is presumed to continue. *See, e.g., Johnson* v. *State*, 56 Ala. App. 583, 324 So.2d 298 (1975); *People* v. *Cooper*, 10 Cal. App.3d 96, 88 Cal. Rptr. 919 (1970); *Commonwealth* v. *Ferguson*, 444 Pa. 478, 282 A.2d 378 (1971). We think this proposition a necessary corollary to the doctrines of *Edwards* and *Wyrick*, and hold that where a person, after receiving *Miranda* warnings, has once given a knowing and intelligent waiver of his constitutional rights, such waiver will be presumed to continue in effect throughout subsequent custodial interrogations until the suspect manifests, in some way which would

be apparent to a reasonable person, his desire to revoke it. There was no evidence here that Washington ever manifested any desire to revoke the waivers he had given, and, therefore, no further warnings or waivers were required.

Dr. Centor's testimony concerning the defendant's mental capacity at the time of the offense was adduced at the punishment stage of the trial. The defense had called the witness to establish, through school records the doctor had studied, that Washington was mentally retarded. The defendant had a right to offer such evidence in mitigation of punishment, even though he had not asserted an insanity defense, because Code § 19.2-264.4(B) specifically provides:

> Facts in mitigation may include . . . the following: . . . (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance or . . . (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired. . . .

Subject to such reasonable limitations as the trial court may impose, a party has an absolute right to cross-examine his opponent's witness on a matter relevant to the case, which the opponent has put in issue by direct examination of the witness. *Basham* v. *Terry, Administratrix*, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958). The issue of the defendant's mental capacity at the time of the crime was relevant and was placed in issue by the defendant, through Dr. Centor, as matter in mitigation. The Commonwealth, on cross-examination, was entitled to explore the scope and limits of the doctor's opinion on this subject, and the trial court correctly so ruled.[4]

The defendant contends that the court erred in admitting into evidence, over his objection, the shirt which Mrs. Williams, Sr., found in a drawer of the dresser removed from the victim's bedroom. He argues that "to have any evidentiary value, the

---

[4] Moreover, if the above ruling had been erroneous, it would not have been sufficiently preserved on appeal to meet the requirements of Rule 5:21. Unless the character of the objection is patent, mere utterance of the word "objection," without assigning grounds, is worthless. It is unfair to opposing counsel, who is expected to respond to it, and to the trial court, which must rule on it.

material must be preserved in its original condition and protected against contamination." He argues that the Commonwealth had the burden, which it failed to carry, of showing a "chain of possession from the time the shirt was removed until it was offered," as a foundation for its admission. Most significantly, the defendant says, the shirt should not have been admitted unless it was shown to be in substantially the same condition when offered as it had been at the time of the offense. He points out that it was materially changed, having been worn by Mr. Williams, Sr., and washed, ironed, and folded by Mrs. Williams, Sr. In addition, the witnesses through whom it was offered testified that the bloodstains found on it had been cut out for laboratory analysis, leaving several small holes.

The defendant's argument misconceives both the nature of the exhibit and the purpose for which it was offered. If the Commonwealth had sought to introduce a scientific analysis of the bloodstains, or of any other foreign matter found on the shirt, or of its own physical properties, proper foundation requirements would have included proof of a chain of custody and a showing with reasonable certainty that the item had not been altered, substituted, or contaminated prior to analysis, in any way that would affect the results of the analysis. *See Robinson* v. *Commonwealth*, 212 Va. 136, 183 S.E.2d 179 (1971). Here, however, the shirt itself was offered, without any scientific tests. In such a situation, chain-of-custody proof is required only in the case of a fungible exhibit, indistinguishable from others of its kind. If the exhibit has a unique characteristic by which it may be identified and distinguished with reasonable certainty from others of its kind, identification by that characteristic is sufficient proof of authenticity. *See Whaley* v. *Commonwealth*, 214 Va. 353, 200 S.E.2d 556 (1973). Here, the defendant identified the shirt as his own by pointing out a unique characteristic he recognized, a place where a patch had been ripped from a pocket. This characteristic was demonstrated to the jury by the witness through whom the exhibit was introduced, and was, with the testimony connecting the shirt to the crime scene, sufficient proof of authenticity.

The relevancy of the exhibit consisted not of the shirt's physical or chemical properties, nor of its condition, but rather as corroboration of the defendant's extrajudicial admissions to the police, which he later denied at trial, that he had been present at the scene of the crime. The changes in the condition of the shirt which

had taken place were immaterial to that purpose because they affected neither the proof of its authenticity nor the proof of the place in which it had been found. Thus, the changes did nothing to impair the admissibility or the probative value of the exhibit, and they were sufficiently explained to avoid any confusion by the jury. There was no error in the admission of this evidence.

The defendant argues that the court abused its discretion by admitting into evidence, over his objection, a color photograph of the nude body of the victim, showing her wounds, on the ground that it is "gruesome," tending to "inflame the emotional passions and prejudice of each juror." Such photographs are frequently offered in homicide cases, even when other evidence is available to establish the elements of the crime. They are often relevant to show motive, intent, method, premeditation, and malice, as well as to show the "degree of atrociousness of the crime." Their admission rests within the sound discretion of the trial court, which will not be disturbed on appeal except for clear abuse. *Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert. denied*, 442 U.S. 924 (1979); *Smith* v. *Commonwealth*, 219 Va. 455, 467, 248 S.E.2d 135, 143 (1978), *cert. denied*, 441 U.S. 967 (1979); *Brown* v. *Commonwealth*, 212 Va. 515, 519, 184 S.E.2d 786, 789 (1971). *See also Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982); *Timmons* v. *Commonwealth*, 204 Va. 205, 129 S.E.2d 697 (1963).

Here, the photograph in question was offered only at the penalty stage, although it might well have been admissible at the guilt stage for the reasons mentioned above. At the penalty stage, it was particularly relevant to the issue whether the defendant's "conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim," Code § 19.2-264.4(C), an issue upon which the Commonwealth had the burden of proof beyond a reasonable doubt.

If a photograph accurately portrays the scene created by a criminal in the commission of the offense on trial, it is not rendered inadmissible merely because it is "gruesome" or shocking. *See Justus* v. *Commonwealth*, 220 Va. 971, 979-80, 266 S.E.2d 87, 93 (1980). One who creates such a scene may not complain if an accurate depiction of his handiwork later confronts him in court. If the law were otherwise, it would offer an incentive to an assailant to visit an extreme degree of mutilation upon his victim,

in order to create a scene so frightful as to shock the sensibilities of the court, and thereby assure himself that it would never be used in evidence against him.

The defendant further argues that the photograph was improperly admitted because it showed a surgical scar, not present at the time of the offense, which was caused by the emergency operation undertaken to stop the victim's internal bleeding in an effort to save her life. When the photograph was introduced, the jury had already heard the testimony of Dr. Grahame Henson, who described the emergency surgical procedures undertaken at Culpeper Memorial Hospital, and that of Dr. Beyer, the medical examiner, who described the condition of the body at autopsy. By this means, the evidence of surgical procedures was fully explained to the jury and differentiated from the wounds left by the assailant. Thus, there was no way in which the jury could have been confused or prejudiced against the accused by the evidence of emergency surgery shown on the photograph.

A court may, in its discretion, admit photographs into evidence which show conditions different from those described by the eyewitnesses, provided the differences are sufficiently explained to avoid distortion of the scene or confusion to the jury. *See Saunders and Rittenhouse* v. *Bulluck*, 208 Va. 551, 558, 159 S.E.2d 820, 826 (1968). *Cf. Chandler* v. *Russell*, 164 Va. 318, 325, 180 S.E. 313, 315 (1935). Thus, the court did not abuse its discretion in admitting the photograph of the victim's body.

Similarly, the defendant also complains of the admission of an aerial photograph which the Commonwealth introduced to show the relationships between the Village Square Apartments, Route 29, and the highway fence, on the ground that it was taken more than a year after the offense, when unspecified "vegetation or plant growth or crops, I guess" would differ from those which existed at the time of the crime. Because none of these changes affected the spatial relationships which the photograph was admitted to show, it was properly admitted.

We are required by Code § 17-110.1(C) to determine whether the death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor," and also to decide whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The defendant contends, as to the first of these inquiries, that the pretrial publicity in the community and

the "inflammatory" photograph of the victim's body admitted in evidence, caused him to be sentenced by a jury that was "tainted with bias and prejudice." We have heretofore considered and rejected the defendant's arguments as to both of these matters. Moreover, from a careful review of the entire record, we find no evidence of "passion, prejudice or any other arbitrary factor" which might have affected the jury's determination of punishment.

Although not argued on appeal, we have also conducted the proportionality review mandated by Code § 17-110.1(C). In so doing, we have accumulated and considered the records in all capital murder cases reviewed by this Court since the enactment of the present statutes, taking particular note of the facts in those cases in which juries imposed capital punishment solely on the basis of the "vileness" predicate, as was done here. We are satisfied from this review that the sentence of death was not excessive or disproportionate. Without provocation, Washington picked out his victim, a stranger, on the street, stalked her to her home, broke in, forcibly raped her, stabbed her 38 times, and left her to bleed to death, all in the presence of her two helpless children. His crime was well within the range of conduct for which Virginia juries have generally imposed capital punishment.

For the reasons stated, we will neither disturb the rulings of the trial court nor commute the death sentence.

*Affirmed.*