# Richmond
## ROBERT OWEN MAYNARD
v.
## COMMONWEALTH OF VIRGINIA
No. 1161-87-2
Decided March 13, 1990

16

COUNSEL

Robert J. Rice (Bremner, Baber & Janus, on brief), for appellant.

Linwood T. Wells, Jr., Assistant Attorney General (Mary Sue Terry, Attorney General; Jim L. Chin, Assistant Attorney General, on brief), for appellee.

OPINION          .

**BENTON, J.**—Robert Owen Maynard was convicted by a jury of rape, forcible oral sodomy, and breaking and entering in the nighttime with intent to commit larceny. Code §§ 18.2-61, 18.2-67.1, and 18.2-89. On appeal, he argues that the evidence was insufficient to support the conviction of breaking and entering with intent to commit larceny and that the trial judge unreasonably limited his cross-examination of two prosecution witnesses. For the reasons that follow, we reverse the convictions.

■ Under familiar principles, where the sufficiency of the evidence is challenged on appeal, we view the evidence in the light most favorable to the Commonwealth and grant to the evidence all reasonable inferences. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). When so viewed, the evidence in this record established that at approximately 3:00 a.m., the victim awakened suddenly when she felt her bed move. Before going to bed she had latched the front screen door but had left the front door partially open for ventilation. The bedroom was only faintly lit by the light of a digital alarm clock on the night stand. As she awakened, an intruder placed his hand over her mouth and said, "shut up. . . . you should not have woken up." He then raped and sodomized her.

When the intruder left, the victim telephoned for assistance. She told the police that she believed Maynard, who lived next door, was the intruder. Later that morning, as the victim searched through her purse for a telephone number to report her absence from work, she discovered that $80 was missing from her wallet. The wallet was described as a man's folded wallet wrapped with a rubber band. The purse containing the wallet was on the floor beside the dresser in the victim's bedroom during the attack.

■ Where, as in this case, "an indictment charges an offense which consists of an act combined with a particular intent, proof of the intent is essential to conviction." *Patterson v. Commonwealth*, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). Although the Commonwealth may prove by circumstantial evidence the specific intent to steal, that proof must be, as in all criminal cases, beyond a reasonable doubt. *Jones v. Commonwealth*, 3 Va. App. 295, 299, 349 S.E.2d 414, 417 (1986).

The circumstantial evidence in this record fails to support an inference beyond a reasonable doubt that the intruder entered the victim's dwelling with the intent to commit larceny. The evidence established that the intruder entered the victim's dwelling sometime between 1:30 a.m. and 3:00 a.m. by cutting through the front door screen. He then assaulted the victim over the course of the next two hours. These circumstances, standing alone, reflect an intent to rape or ravish rather than an intent to steal from the victim.

The Commonwealth argues, however, that Maynard's intent to commit larceny may be inferred from the fact of the completed crime. *See Smyth v. Morrison*, 200 Va. 728, 734, 107 S.E.2d 430, 435 (1959) ("Where larceny has actually been committed that is the best evidence of the intent with which the breaking was committed"). To conclude on the record before us that a larceny in fact occurred, however, would require speculation. The most that was proved or that reasonably can be inferred from the evidence is that a sum of money was discovered missing from the victim's wallet on the morning after the assault. Even if we were to assume from this evidence that the money was stolen rather than misplaced, the evidence nevertheless fails to exclude the reasonable hypothesis that someone other than the intruder took the money on another occasion. By her own admission, the victim could not recall the last time she had seen the money. She further acknowledged that she did not keep her purse in a secure place while at work.

Other facts in the record render improbable the Commonwealth's theory that the intruder intended to steal and did steal the money before raping the victim. According to the victim's testimony, the bedroom was quite dark. The wallet had been wrapped several times with a rubber band and tucked inside her purse on the floor. When she retrieved her purse from its resting spot the morning after the attack, she noticed nothing unusual about its appearance. Neither the purse nor the wallet bore any obvious signs of tampering. Furthermore, nothing else in the victim's home was moved or reported missing. On this evidence, the trier of fact could find an intent to commit larceny only by resorting to surmise and speculation. *See Patterson*, 215 Va. at 699, 213 S.E.2d at 753. "Whenever the evidence leaves indifferent which of several hypotheses is true, or merely establishes only

some finite probability in favor of one hypothesis, such evidence does not amount to proof beyond a reasonable doubt." *Sutphin v. Commonwealth*, 1 Va. App. 241, 248, 337 S.E.2d 897, 900 (1985). We, therefore, reverse the conviction for breaking and entering with intent to commit larceny.

Maynard next contends that the trial judge erred in restricting his cross-examination of Detective Valentine. On the Commonwealth's direct examination, Valentine testified that he interviewed Maynard the afternoon of August 14 after the victim had named Maynard as a suspect. When the Commonwealth's attorney asked why Maynard was not arrested on August 14, Valentine responded that he was "involved in this matter only temporarily" and was "only to keep things in a holding pattern until a Crimes Against Persons Investigator could become involved." During cross-examination, Maynard's counsel sought to impeach Valentine's testimony by asking questions that sought to establish that Valentine had not arrested Maynard on August 14 because the detective believed that the evidence was insufficient to arrest Maynard.[1] The trial judge refused to allow this line of questioning, ruling that the inquiry would be misleading to the jury in view of Valentine's testimony on direct that he was only handling the case temporarily. The judge also refused to allow defense counsel to impeach Valentine by his previous testimony. We conclude that the trial judge erred.

The right of cross-examination is fundamental to the truth-finding process and is an absolute right preserved to the accused by the constitutional guarantee of confrontation. *Barrett v. Commonwealth*, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986);

---

[1] At a previous trial ending in a mistrial, Maynard's counsel had asked the following questions of Valentine without objection from the Commonwealth:

Q: Did you place him under arrest at that time (during the August 14, 1986 interview)?
A: I did not.
Q: Did you figure you had sufficient evidence at that point to place him under arrest?
A: I did not.
Q: Would you have felt comfortable arresting him at that point?
A: I would not have.
Q: You did not arrest Bobby Maynard on the 14th of August, true?
A: That is correct.
Q: Was the reason because it was going to be reassigned or because you did not have enough evidence or both?
A: Both.

*Moore v. Commonwealth*, 202 Va. 667, 669, 119 S.E.2d 324, 327 (1961). The trial judge may exercise discretion to prohibit the abuse of cross-examination, but this discretion may only be employed after the right to cross-examine the witness has been substantially and fairly exercised. *Barrett*, 231 Va. at 108, 341 S.E.2d at 194. "Subject to such reasonable limitations as the trial court may impose, a party has an absolute right to cross-examine his opponent's witness on a matter relevant to the case, which the opponent has put in issue by direct examination of the witness." *Washington v. Commonwealth*, 228 Va. 535, 549, 323 S.E.2d 577, 587 (1984), *cert. denied*, 471 U.S. 1111 (1985). As our Supreme Court stated in *Baltimore, Chesapeake & Atlantic Ry. v. Hudgins*, 116 Va. 27, 81 S.E. 48 (1914), "it is not irrelevant to inquire of the witness whether he has not on some former occasion given a different account of a matter of fact *to which he has already testified*, in order to lay a foundation for impeaching his testimony by contradicting it." *Id.* at 32, 81 S.E. at 49 (emphasis in original). This is so even though the matter is collateral or immaterial to the issue in the case. *Id.* at 31, 81 S.E. at 49; *see also Avocet Dev. Corp. v. McLean Bank*, 234 Va. 658, 668-69, 364 S.E.2d 757, 763 (1988).

On four occasions during direct examination the Commonwealth asked the detective why he did not arrest Maynard. Although Valentine had previously testified under oath that he had two reasons for not arresting Maynard, on this examination Valentine gave only the reason that he was in a "holding pattern" waiting for another investigator to arrive. Thus, despite Valentine's prior sworn testimony that he did not arrest Maynard because he did not believe he had sufficient evidence, the Commonwealth, through its questions on direct examination, sought to convince the jury that Valentine did not arrest Maynard because Valentine was awaiting assistance from other officers. The trial judge's restriction on the cross-examination of the detective may have caused the jury to assign more weight to his testimony than it otherwise might have done, thus indirectly bolstering the victim's testimony.

Considering the circumstances surrounding the victim's identification of Maynard as the intruder, including the lighting conditions, the fact that the victim was not wearing her contact lenses, and the different height estimates she provided of the intruder, the

facts linking Maynard to the crime were not conclusive. The excluded evidence in this case was pertinent to explain Detective Valentine's testimony on direct examination. Having opened the door to inquiry in this area on direct examination, the Commonwealth cannot now be heard to complain that Detective Valentine's reasons for not arresting Maynard were irrelevant to the issues in the case. By refusing to permit the defendant to cross-examine Valentine concerning matters that Valentine testified to on the Commonwealth's direct examination, the trial judge deprived the defendant of the fair exercise of his right of cross-examination.

Maynard next argues that because the victim had sworn on a Bible to tell the truth, an inquiry into the victim's possible satanic belief was relevant to impeach her truthfulness. We find no error in the court's refusal to limit examination of the victim concerning the meaning of certain tattoos on her body and her beliefs.

At trial, the victim testified that during the attack, the intruder revealed knowledge of the presence and location of tattoos on her body. She described one of these tattoos as a crescent moon with stars surrounding it. Defense counsel informed the trial judge that his cross-examination of the victim would include the following:

His Honor will recall she testified previously, and I am going to lay a foundation, she said that several years ago she had gotten away from the Christian faith and that is when she got these tattoos, ten years ago. She described the one with the crescent moon and the stars. I intend to ask her if she is aware that that is the symbol of a Satan. I have contacted a Tattoo parlor and I think that she has taken an oath to testify to tell the truth, so help me God, and she has testified at one point in time that she has gotten away from the Christian faith. I think I am entitled to question her as to the relevance of that.

The trial judge refused to allow this inquiry but allowed defense counsel "to ask her what significance, if any, she has attached to [the tattoo]."

The record of the cross-examination of the witness reflects that she testified that she was not aware of the significance of the symbols:

Q: It is a crescent moon with some stars around it; is that correct?
A: Yes, sir.
Q: Does that have any significance to you?
A: Not besides the fact that I thought it was attractive when I picked it out.
Q: That is the only significance it has to it?
A: Yes, sir.
Q: You testified, did you, that you got those tattoos about the time that you started getting away from being a Christian; is that correct?
A: Not away from being a Christian, but a little rebellious and going out and staying out late.
Q: If I told you that your statement on February 11th was that, I had gotten away, I had been raised a Christian and I had gotten away from it, is that true or not true?
A: That is true.
Q: That is the time you got the moon with the stars?
A: Yes, sir.

In view of the victim's professed lack of knowledge concerning the tattoo symbol and in the absence of a proffer on the record of the further evidence sought to be introduced, *see Barrett*, 231 Va. at 108, 341 S.E.2d at 194, we conclude that the trial judge did not err in limiting the examination of the victim concerning her beliefs.

In summary, we find the evidence insufficient to sustain the conviction of breaking and entering with intent to commit larceny. We, therefore, reverse that conviction and dismiss the indictment as to that charge. Because of the limitation of the cross-examination of Detective Valentine, we also reverse the conviction of the rape and forcible sodomy charges and remand the case with leave to retry Maynard if the Commonwealth be so advised.

*Reversed and dismissed in part;*
*reversed and remanded in part.*

Baker, J., concurred.

Cole, J., concurring in part and dissenting in part.

I dissent from the majority opinion holding that the trial court unreasonably limited the cross-examination of Detective Richard

I. Valentine. I believe that the trial judge properly ruled upon the admissibility of the several questions before him and properly excluded the evidence concerning probable cause that the defendant sought to obtain from Valentine. I also believe that, in the event the ruling of the trial court was erroneous, it was harmless error under the circumstances of this case.

To understand the ruling of the trial judge, one must understand the factual circumstances in which the issue arose at the first trial. Three indictments charged that Maynard committed rape, forcible sodomy and common law burglary in Henrico County on August 14, 1986. Uncontradicted evidence at both the first and second trials established that the Henrico County Police Department was organized into sections, Crimes Against Persons and Crimes Against Property. Detective Valentine was a member of the Property section. Because the night of August 13, 1986, was a busy one for the "Persons" section and all of its investigators were handling unrelated homicides elsewhere in the county, Valentine was temporarily assigned by his supervisor to investigate the present rape case.

According to Valentine's testimony at the first trial, he arrived at the Dabbs House, the Henrico County east end precinct, at 8:00 a.m. on August 14, 1986. He discussed the case with Officer J. R. Tucker, who had taken a preliminary investigative report on the incident from the victim, and had briefly interviewed her. Valentine took the victim to MCV Hospital, where a routine physical examination for rape victims was made. Upon completion of the examination, Valentine went with the victim to her home to view the crime scene. At her home, Valentine only viewed the crime scene because Detective Tiller had already tried to obtain fingerprints and had taken pictures.

At the first trial, Detective Valentine answered the following questions by the Commonwealth's attorney:

Q. Did you place him [Maynard] under arrest at that time?
A. I did not.
Q. Did you figure you had sufficient evidence at that point to place him under arrest?
A. I did not.

Q. Would you have felt comfortable arresting him at that point?
A. I would not have.
Q. What would you have wanted to do if you were investigating the case, to abide [sic] by the arrest?,
A. I would have wanted more probable cause than I had at that particular point. And, once, again, I did not feel that I had it. Also, once again, it was not my matter.

According to Valentine's further testimony at the first trial, he interviewed Maynard at his home on the afternoon of August 14, 1986. He did not advise Maynard that he was a suspect or the identity of the victim. He asked for Maynard to account for his whereabouts the previous night and Maynard responded by saying that he came home and went to bed about 2:10 a.m. and stayed in the house until 9:30 a.m. At this point in the first trial, the Commonwealth's attorney, without objection, asked Valentine substantially the same questions he had previously addressed to him after the morning visit at the crime scene with the victim, including whether, after the interview with Maynard, he had placed him under arrest, whether he believed he had sufficient evidence to arrest him and whether he would have felt comfortable arresting him at that point. Valentine responded that he "would have wanted more probable cause that [sic] I had at that particular point. And once, again, I did not feel that I had it. Also, once again, it was not my matter." Once Valentine mentioned "probable cause," the Commonwealth's attorney asked Valentine, without any objection, to explain what is required to be proved to establish probable cause, and to explain the difference between probable cause and proof beyond a reasonable doubt. Valentine answered the question the best he could under the circumstances.

Thereafter, defense counsel extensively cross-examined Valentine about the function of a preliminary hearing, the arrest, and the requirements to prove probable cause, culminating in the following exchange:

Q. You didn't arrest Bobby Maynard on the 14th of August, true?
A. That's correct.
Q. Was that reason because it was going to be assigned or because you didn't have enough evidence, or both?

A. Both.

This totally irrelevant evidence was produced at the first trial without objection from anyone. The trial court did not intervene. The evidence served only to distract the jury away from the main purpose of the trial, which was to determine the guilt or innocence of the defendant. *See Brown v. Commonwealth*, 3 Va. App. 182, 185-86, 348 S.E.2d 849, 851 (1986).

During the second trial, Valentine's relevant testimony concerning the actual facts of his investigation was identical to his testimony in the first trial. In response to questions by the Commonwealth's attorney, without objection from the defendant, Valentine again testified that he did not place Maynard under arrest, did not secure an arrest warrant for him, and had not gone to a magistrate in an attempt to get a warrant after the interview with the victim on the morning of August 14, 1986, or after the interview with Maynard in the afternoon. In response to the question, "Why not?" Valentine said:

I had taken the information from [the victim]. I had evaluated what she had told me but mostly because at that point, as I said before, I was involved in this matter only temporarily. I was given orders as to what to do and that is what I was going to do unless something drastically happened. My intentions when I responded out to the Dabbs House to speak to [the victim], and during this whole investigation was only to keep things in a holding pattern until a Crimes Against Persons investigator could become involved.

Unlike the first trial, in the second trial the Commonwealth's attorney did not ask any questions about "probable cause," and the exchange between defense counsel and Valentine constitutes the basis for the problem we address. The exchange between defense counsel and Valentine was as follows:

Q. Are you familiar with the term Probable Cause, Det. Valentine?
A. I am familiar with the term, yes, sir.
* * * *

Q. When you go before a Magistrate and tell the Magistrate I would like an arrest warrant for anybody, you are swearing under oath, 1: that you have a reasonable belief that a crime has been committed? 2: that a reasonable belief that x committed the crime; is that correct?

A. Exactly.

Q. Did you not have that reasonable belief in this case? Did you, Det. Valentine?

A. Mr. Rice, I was not there at that point looking for that reasonable belief. I was not. My function was not to try and find that reasonable belief.

Q. I understand but based on the information you had from your interview with [the victim], from your information from Mr. Tucker, from your interview with Bobby Maynard, from everything that you know about this case, you did not feel that you had probable cause to make an arrest in this case, did you?

Although the Commonwealth's attorney made no objection, the last question was never answered. The trial judge intervened, excused the jury, and held a discussion with counsel. In argument on the appropriateness of the question, the Commonwealth's attorney said, in pertinent part:

We are getting before the jury the view of the police officer's beliefs that are not at all relevant in this case. Facts are what the jury believes about the evidence and that is what is important. I believe to have the Police Officer say I did not believe this witness or I didn't think this, I think that is an improper way to comment on it. That is improper to put before the jury.

In response, defense counsel stated:

Judge, I would like to ask him the exact questions from a page that I asked him from the previous trial simply because this was admissible in the previous trial.

In my opinion, the question asked by defense counsel was clearly inappropriate for a number of reasons. Valentine's belief as to the existence of probable cause to arrest was irrelevant to the issue of guilt or innocence of the defendant. Moreover, the infor-

mation that Valentine had received from the victim and the defendant was contradictory. The question required the detective to resolve the conflict in the evidence which was not his prerogative to do. *See* C. Friend, *The Law of Evidence in Virginia* §§ 201-04 (3d ed. 1988). The trial court ruled the question improper, finding that what Detective Valentine thought was not material to the issues in the case. However, he further allowed the defendant to "ask Detective Valentine if you want to, why he did not arrest Mr. Maynard." Valentine was, in fact, asked this question out of the presence of the jury, and he responded:

Because I was then involved in the case only temporarily and I knew from the order that I had received, the case was going to be reassigned.

Since the trial judge would not permit the defendant to ask the same questions concerning "probable cause" that counsel had asked in the first trial, he proffered for the record the questions he proposed to ask and the responses Valentine had given when asked the same questions in the first trial. The proffered questions and answers are as follows:

(1) Q. Did you place him under arrest at that time?[2]
A. I did not.
(2) Q. Did you figure you had sufficient evidence at that point, to place him under arrest?
A. I did not.
(3) Q. Would you have felt comfortable arresting him at that point?
A. I would not have.
(4) Q. What would you have wanted to do if you were investigating the case, to abide by the arrest?
A. I would have wanted more probable cause than I had at that particular point. And once, again, I did not feel that I had it. Also, once again, it was not my matter.
(5) Q. In your experience, when you have a victim, regardless of what type of case it is, tells you that they positively identify somebody, you obtain a warrant for their arrest, do you not?

[2] I have numbered the relevant questions for identification purposes.

A. Most of the time. Most of the time. And I will only clarify that by saying that it depends on the victim, or it depends on the witness, but I would say in most of the time, yes, I would go ahead and obtain a warrant.

(6) Q. If you were not sure about what the victim has said, then that would cause you not to obtain a warrant, isn't that correct?

A. I would say if I had some doubts about the victim, or the witness.

Question one was answered by Valentine on direct examination. Questions two, three and four were inappropriate because what Valentine "figured," what he would have felt "comfortable with," and what he would have "wanted" if he were investigating the case, were irrelevant to the issues in the case. Questions five and six were inappropriate for the same reasons. At best, the evidence sought to be adduced was a matter for the exercise of judicial discretion. The trial judge did, in fact, permit defense counsel to ask substantially the same type of question on cross-examination:

Q. No, Det. Valentine, I asked you these questions some-time in February [the first trial]. I want to read them to you and your responses. You tell me if they are accurate. I asked you when you have an eyewitness, you have arrested people before, have you not, when an eyewitness or a victim has told you that so and so did it? Your response is, that is correct. Is that an accurate statement?

A. Yes, sir.

Q. Is that an accurate statement today?

A. Yes, sir.

Q. You have arrested that person with nothing else, just gone out and gotten a warrant when John Jones comes in and says Bob Rice assaulted me with a knife, positively identifying, you out and get a warrant on occasions, is that correct? Your answer was, that has happened. Yes, sir. Is that accurate?

A. Yes, it is.

In my judgment, the trial court did not unjustifiably limit the cross-examination of Detective Valentine. To the contrary, I believe the cross-examination, if anything, was extended impermissibly to matters irrelevant to the issues in the case. The issue before us is whether the trial judge committed reversible error when he refused to permit the defendant to ask Valentine: "Did you not make an arrest because the case was going to be reassigned to somebody else, or, 2, because you did not have enough information, or both?" The purpose of the question was to lay the foundation to impeach Valentine. The defendant's contention is that the trial court committed reversible error in refusing to allow the defendant to ask this question in view of the fact that Valentine, at the first trial, gave two reasons for his failure to arrest the defendant and in the second trial, gave only one. Thus, the defendant argues he was denied the right to impeach Valentine on the basis of contradictory responses. He argues that he had an absolute right to cross-examine the witness on any relevant matter which was put in issue on direct examination by the Commonwealth.

Detective Valentine, in effect, was asked to give his legal opinion on whether he had enough evidence or information to constitute probable cause to secure a warrant for Maynard's arrest. This would involve an assessment of the weight of the evidence and the credibility of the witnesses, issues that are reserved exclusively for the fact finder. Professor Friend states that "[t]he nonexpert is not permitted to testify as to the legal effect of facts observed." He further states that a lay witness may not testify as to "guilt." C. Friend, *supra* § 211. "Limitation of cross-examination is a matter within the sound discretion of the trial court and is subject to review only for abuse of discretion." *Naulty v. Commonwealth*, 2 Va. App. 523, 529, 346 S.E.2d 540, 543 (1986). Further, "an assessment of the prejudicial effect of evidence against its probative value is a matter largely within the discretion of the trial court." *Gray v. Graham*, 231 Va. 1, 10, 341 S.E.2d 153, 158 (1986). I do not believe that the Commonwealth attorney's interrogation of Valentine opened the door to such a grossly improper question in the second trial. The trial judge was acting within his discretionary power when he excluded this totally immaterial and irrelevant evidence.

Assuming that the trial court did commit error in ruling upon this issue, I believe that the ruling clearly was harmless error. The

United State Supreme Court held in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Id.* at 684. Under the Court's reasoning, "the correct inquiry is whether assuming that the damaging potential of the cross-examination were fully realized, the reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.*; *see also Shanklin v. Commonwealth*, 222 Va. 862, 864-65, 284 S.E.2d 611, 612-13 (1981); *Williams v. Commonwealth*, 4 Va. App. 53, 78, 354 S.E.2d 79, 93 (1987).

Factors cited in *Van Arsdall* as important to the harmless error inquiry are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and, the overall strength of the prosecution's case." 475 U.S. at 684. I will discuss each factor in the order named.

Valentine's testimony was insignificant to the prosecution's case. He was only involved in the investigation for *one day* and had made it clear on numerous occasions that he was involved on a temporary basis until an investigator from the "Persons" section became available. Valentine met the victim at Dabbs House on the morning of August 14, 1986. The only substantive testimony he gave about the meeting was that the victim was nervous and upset. Valentine's testimony was not adverse to Maynard because Maynard did not dispute that the victim had been raped. Maynard's defense was that he did not do it. The fact that she was upset and nervous was confirmed by Dr. Richard Rinehardt at MCV Hospital, Henrico County police officer J. R. Tucker and several members of the victim's family.

Valentine took the victim to MCV Hospital to be physically examined by Dr. Rinehardt. Valentine testified that he took no part in the examination and was across the hall in a separate room. Valentine gave no testimony concerning the physical examination, except to say that one had occurred. Certainly this testimony was not adverse to Maynard.

After the physical examination, Valentine went with the victim to her home to look at the crime scene. He did not testify concerning anything of significance learned on this visit. He testified that the only thing he did was to look, since Detective Thomas M. Tiller had already been to the home and had tried to obtain fingerprints and take pictures. Certainly this testimony was not adverse to Maynard.

Valentine's next involvement occurred about 3:00 p.m. when the victim called and advised Valentine that Maynard was at home next door cutting grass. She wanted someone to come and interview him. Valentine, out of a sense of duty, went to Maynard's home and discussed the matter with him. At trial, Valentine was shown a photograph taken of Maynard on September 2, 1986, at the time of arrest. Valentine testified that in the photograph Maynard looked as he had looked at the interview on August 14, 1986. This testimony certainly was not adverse to Maynard, since there was no dispute that the photograph was, in fact, of Maynard. The victim also testified that the photograph was that of Maynard as he looked on August 14, 1986. The photograph was introduced through Detective Ross, who said he took it on September 2, 1986, at the time of Maynard's arrest. Jack Maynard, the defendant's father, was shown the same photograph and, after acknowledging that his son always had long hair and a mustache, testified that the picture looked "normal to me."

Concerning the interview, Valentine testified that he asked Maynard to account for his whereabouts the previous night. According to Valentine, Maynard answered that he had come home about 2:10 a.m., went to bed, stayed in the house until about 9:30 a.m., got up, and went with Barry Foreman to the Last Chance restaurant. The only other evidence in the case concerning Maynard's activities came from Detective Ross who testified that Maynard told him that on the night in question he had left the Pit Stop about 2:15 a.m. and "bummed" a ride home, a distance of about six to eight miles, with a man at the bar.

On cross-examination, defense counsel asked Valentine if, at the interview with the victim on August 14, 1986, she told him that she felt her assailant was the person who lived next door to her. Valentine responded that she did but that she never came out directly and said that Bobby Maynard raped her. Further, on cross-examination, Valentine testified that at the Maynard inter-

view Maynard did not wear a thick belt nor had he seen such a belt at the Maynard house, thus confirming Maynard's argument that he had no such belt as described by the victim in her testimony. In sum, Detective Valentine's testimony contributed nothing to the Commonwealth's case and especially to the main issue, which was the identification of the criminal agent.

Other factors specified in *Van Arsdall* for consideration are whether Valentine's testimony was cumulative and the presence or absence of evidence corroborating or contradicting the material points of witness's testimony. The only issue in the case was whether the defendant was the one who committed the rape and sodomy. Valentine's testimony was uncontradicted on any material point. The fact that Valentine testified that Maynard told him that he arrived at home at 2:10 a.m., but according to the testimony of Ross, stated that he left the Pit Stop about 2:15 a.m. to go home, shows that Maynard was inconsistent, not Valentine. Maynard did not dispute the testimony of either Valentine or Ross. This contradiction, if it is such, certainly is not such a material discrepancy that it would warrant a conclusion that the jury would have reached a different verdict had the trial judge permitted Valentine's impeachment, as requested by the defendant.

The Commonwealth's case was a strong one. The victim gave a carefully considered identification of the defendant. After reporting the incident to the police, the victim, in her first police interview with officer J. R. Tucker, gave a description of her assailant and suggested her next door neighbor, Bobby Maynard, as a suspect. She told the police officer that "she felt it was Bobby Maynard who had done it." In her statement to the nurse at MCV Hospital, she described her assailant as average built, five feet seven inches to five feet nine inches tall, shorter-medium long hair, needing a shave, and with lots of hair under his nose line. The following day, after Detective Ross was assigned the case, the victim told him that she was 99.9 percent certain that her assailant was Bobby Maynard, and she could be 100 percent certain if she heard his voice. She did, in fact, hear his voice on the telephone and immediately concluded that Maynard was her assailant. She advised the police of the conversation.

At trial, the victim positively identified Maynard as her assailant. As further support for the accuracy of her identification, she testified that she could see well enough during the attack to dis-

cern a mustache and could see the silhouette and the body build of her assailant. She further testified that at one point during the incident he said: "Donna, I like you, and I know who you are." At another time he said: "I am going to have to kill you. I know you know who I am." He also said: "I know you have got a tattoo here and I know you have got a tattoo here" and he put his right hand on the tattoo marks without looking at the locations. Maynard told Detective Ross that he knew the victim only by her first name, Donna. The victim testified, however, that she was not proud of the tattoos and did all she could to keep them covered. She testified she wore bathing suits, shorts and shirts in her yard when cutting her grass, which exposed her back from time to time, and that Maynard, only several weeks prior to the incident, had the opportunity to observe them.

The Commonwealth's case was further strengthened by the victim's testimony that when the assailant left her home after the rape at 5:00 a.m., he said he had to be somewhere in twenty minutes. Maynard's father, Jack Maynard, testified that he had to wake his son at 5:20 a.m. for him to get ready for work.

Additional corroboration of the Commonwealth's case is found in the testimony of Mary Jane Burton, supervisor of the Serology Section at the Bureau of Forensic Science for the State of Virginia. She examined and compared samples of blood and body secretions, hair and fibers taken from the victim and Maynard. Although Burton could not tell from her comparisons whether Bobby Maynard committed the crimes, she could conclude from her examinations of the blood, body secretions, hairs and natural fibers whether Maynard was within a group of persons who could be included or excluded from the group of persons who could have committed the acts. She testified that Maynard was included. Her testimony showed that the victim has type A blood and Maynard has type O. She described a masking phenomenon that makes type A more powerful and hides type O. Immediately after the assailant performed oral sodomy on the victim, he smoked a cigarette and left the butt on the window sill in the bedroom. Secretions on the butt disclosed the existence of type A blood. If Maynard had smoked the cigarette, one would have expected to find type O. Burton testified about the transfer of body fluids and if secretions occurred during the act of oral sodomy, the victim's secretions would combine with the assailant's saliva, and type A

blood would be found on the cigarette butt.

Burton also examined hairs that were taken from the victim's bedsheets. Two of the head hairs and three pubic hairs were consistent with samples of hair taken from Maynard. Burton explained that she looked at fifteen characteristics and in order to say that the hair samples were consistent, the unknown hair needs to fit within the range of the person's known hair.

It is apparent that Detective Valentine did not contribute any testimony that had any bearing on the identification of Maynard as the criminal agent in this case. Therefore, even if the trial judge had permitted the defendant to answer the questions proposed, an impeachment of Valentine would have had no effect upon the outcome of the case. The deletion from the record of Valentine's testimony does nothing to undermine the strength of the Commonwealth's case.

The majority states that, considering the circumstances surrounding the victim's identification of Maynard as an intruder, the facts linking Maynard to the crime were not conclusive. The twelve members of the jury and the trial judge found otherwise. As for the lighting conditions, the majority states that "[t]he bedroom was only faintly lit by the light of a digital alarm clock on the night stand." This conclusion fails to assume the evidence in the light most favorable to the Commonwealth. The victim testified that when Maynard entered her bedroom sometime after 3:00 a.m., there was light in the room from the digital clock. She said the room was partially dark, which would imply that it was also partially light. According to her testimony, she "could see enough to know a mustache and the silhouette, and the body and the build." At this time, she admitted that she did not get "a detailed shot of the face." However, she observed "the silhouette with the haircut and the mustache and I never could have given an eye color or birthmark or anything like that." She further testified that by 5:00 a.m. her eyes had become adjusted to the darkness and as morning approached, the house got lighter. Evidence in the record discloses that, in addition to light from the moon and the sun, there was a street light directly in front of the house thirty to forty yards away and directly behind the house, there was a service station with lights. Upon this evidence, the jury was entitled to conclude that the lighting in the room consisted of more than the light of the digital clock, although that may have been suffi-

cient. Maynard left the bedroom shortly before 5:00 a.m., presumably to leave the house. He returned in a minute or two and the victim testified that she got her best glimpse of him when he came through the hallway and walked over to her bed. In fact, Maynard commented that he had to leave because "it is getting light."

The majority opinion states that "the excluded evidence in this case was pertinent to explain Detective Valentine's testimony on direct examination." However, the opinion neither states precisely what the excluded evidence is that it refers to nor does the opinion identify precisely what portion of Valentine's testimony on direct examination it seeks to explain. I, therefore, dissent from this part of the opinion.

I concur with the majority in finding the evidence insufficient to sustain the conviction of breaking and entering with intent to commit larceny. I further agree with the majority that the trial judge did not err in limiting examination of the victim before the jury concerning her religious beliefs.