# Richmond

## Baltimore, Chesapeake and Atlantic Railway Company v. Hudgins.

### March 12, 1914.

#### Absent, Cardwell, J.

1. Appeal and Error—*Ruling on Evidence—Harmless Error.*—The ruling of the trial court on the admission or rejection of evidence will not be reviewed where it clearly appears that the objector was not prejudiced thereby.

2. Evidence — *Admissibility—Order of Introduction—Relevancy.*— Evidence which on its face, or in the then state of the proof before the jury, is not admissible, should be excluded by the court, unless the party offering it makes such avowals as to what he expects to prove as will show its relevancy.

3. Witnesses—*Impeachment—Collateral Matters—Prior Inconsistent Statements.*—In order to lay a foundation for impeaching the testimony of a witness by showing a prior inconsistent statement, he may be asked if he has not, on a former designated occasion, given a different account of a matter of fact to which he has already testified. Such evidence is not irrelevant, but properly admissible, although collateral or immaterial to the issue in the case.

4. Carriers — *Stranded Vessel—Negligence After Stranding—"Harter Act."*—While the "Harter Act' of Congress relieves the owner of a vessel from liability if he brings himself within the provisions of the act, for example, by showing that the stranding resulted from faults or errors in navigation, or in the management of the vessel, or from dangers in the stream; it does not relieve him from the exercise of a reasonable degree of skill and diligence under all the circumstances of the case, in preserving and caring for the shipper's goods.

5. Carriers—*Damages—Perishable Goods—Negligent Failure to Deliver.*—If, on account of negligent delay in delivering a cargo of fresh fish, the fish are worthless, or in such condition that they will become so before they can be disposed of on the

market by the exercise of reasonable care and diligence, the measure of damages is the market value of the fish at the place of delivery as of a time of reasonable delivery, less the freight charges thereon; but if at the time and place of delivery the fish were simply damaged, but not so damaged as to render them unfit for the market, then the measure of damages is the difference between the value of the fish at the time of a reasonable delivery and the best price which could have been obtained therefor, after deducting from such price any extra expense incurred in selling them.

6. Carriers—*Perishable Goods—Refusal to Accept—Duty to Sell.*— If after the consignee refuses to accept perishable goods, such as fresh fish, the carrier can sell them, it is his duty to do so.

7. Carriers—*Perishable Goods—Damaged Condition—Refusal to Accept—Liability of Carrier.*—Although perishable goods may have become a total loss by reason of the failure of the consignee to receive them in a damaged condition, still the carrier is liable in damages, if he has negligently delayed delivery, for the difference between the value of the goods if delivered in a reasonable time and their value when delivered in a damaged condition. He is not relieved of all liability because the consignee may have failed in the performance of his duty.

Error to a judgment of the Circuit Court of Mathews county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*J. Boyd Sears* and *Jos. W. Chinn, Jr.,* for the plaintiff in error.

*J. N. Stubbs, J. R. Saunders,* and *Henley, Garnett & Hall,* for the defendant in error.

Buchanan, J., delivered the opinion of the court.

This action was brought by R. L. Hudgins, trading as R. L. Hudgins & Company, against the Baltimore, Chesa-

peake and Atlantic Railway Company. These parties will hereafter in this opinion be designated, respectively as plaintiff and defendant.

The object of the action was to recover damages for the loss of twenty-three boxes of fresh shad, delivered by the plaintiff to the defendant at Callis' wharf, Mathews county, for transportation to Baltimore, Maryland. It appears that on Thursday, April 4, 1912, the plaintiff delivered to the *Old Point Comfort,* one of the defendant's steamers, these boxes, containing four hundred and fifty-five buck shad and six hundred and thirty-four roes; that the fish were taken from the traps of the plaintiff on April 3, 1912, iced, and packed on that date; that the steamer *Old Point Comfort* left Callis' wharf, on the Piankitank river, at about 2:30 o'clock p. m. on April 4, and was scheduled to arrive in the city of Baltimore, the point of destination of the shipper's fish, at about seven o'clock on April 5 (Friday). Instead of arriving at the usual time in Baltimore, the *Old Point Comfort* never reached that city upon its return trip from Virginia, but grounded in Dividing creek, a small stream in Northumberland county, Virginia, and while being grounded transferred the perishable cargo to her sister ship, the steamer Piankitank, which latter ship also grounded, and arrived with the cargo of fish in the city of Baltimore at about 2:15 p. m. Saturday, April 6, after the market had closed, and after a delay of thirty hours or more.

The commission merchants to whom the fish were consigned refused to receive the shipment, and during that evening and night most of the cargo of fish delivered in Baltimore by the Piankitank was condemned by the health officers of that city.

The first error assigned is to the action of the court in refusing to permit a witness to testify to the contents

30 Balto. Ches. & A. R. Co. *v.* Hudgins, 116 Va. 27.

Opinion.

of a message sent by one of the shippers of fish by telephone to the telegraph operator at Gloucester Court House to be forwarded by telegraph to Baltimore, Maryland. The objection made to the evidence was that the original telegram sent from Gloucester Court House was the best evidence of the contents of the telephone message. The court so held and refused to permit the witness to testify unless it was shown that the original telegram could not be produced.

Whether or not the court's ruling was correct, it is clear from the bill of exceptions saving the point and the bill of exceptions containing all the evidence introduced, that the defendant was not prejudiced by the court's action. The purpose of the evidence, as stated in the bill of exceptions, was to show "that the message was to George A. Albaugh, secretary of the Fish Dealers' Association of Baltimore, Md., advising him that the steamer *Old Point Comfort* was aground and instructing the fish dealers not to receive any fish shipped by the *Old Point Comfort* on April 4th." It is now claimed that the object of the evidence was to show a conspiracy between the shippers of fish and their consignees that the latter should not and would not receive the fish on account of the delay in their arrival, and to hold the defendant responsible although the fish reached Baltimore in good condition.

The plaintiff did not send the message. There is nothing in the record, in the proof, or in the avowal of counsel, to show that the plaintiff was responsible for, or had any connection with, the message, or even knew that it had been sent, or that he was a party to the conspiracy alleged in the petition. Evidence which on its face, or in the then state of the proof before the jury, is not admissible, should be excluded by the court, unless the party offering it makes such avowals as to what he

expects to prove as will show its relevancy. I Elliott on Ev., sec. 191.

The second assignment of error is to the action of the court in permitting the captain of the *Old Point Comfort* to be asked on cross-examination the following question: "Did you not on the morning of your return from Dividing creek, on Saturday, state at Fitchett's Wharf, in the presence of Mr. John Hundley and others, that your grounding was due to the search light going out on you?"

The objection made to the question was, that any statement made by the witness, who was a servant or employee of the defendant, on the occasion and under the circumstances indicated by the question and shown by the record, was not within the scope of his employment, and not made while engaged in the transaction under investigation and was, therefore, irrelevant and immaterial, and that a foundation for contradicting a witness cannot be laid by cross-examining him on irrelevant and immaterial matters. The court permitted the question to be asked for the purpose of laying the foundation for contradicting the witness.

Capt. Evans had testified in his examination in chief that his vessel had gone ashore from a cause different from that stated in the question asked. While what he may have said on the occasion indicated by the question was not evidence against the defendant, since it is not shown that the statement was made in the performance of his duty (*Lynchburg Tel. Co.* v. *Booker*, 103 *Va.* 594 50 *S. E.* 148) it was competent for the purpose, as the court held, of laying the foundation for contradicting him, although it was collateral or immaterial to the issue in the case.

Under what circumstances a witness may be contradicted as to such statements is clearly stated by Allen,

P., in the case of *Forde* v. *Com'th,* 16 Gratt. (57 Va.) 547, 556-7: "It is a well settled rule," he says, "found in all the text-writers upon evidence, that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony. And if a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question, but it is conclusive against him. 1 Greenl. Evidence, sec 449. The rule was recognized, and the reason stated why his answer cannot be contradicted in the case of *Charlton* v. *Unis,* 4 Gratt. 58; where it is said this would be unjust to the witness and the party introducing him; for though every witness may be supposed to come prepared to sustain the truth of his testimony given on the trial, he cannot be expected to come prepared to prove the truth of every collateral statement he may have made on another occasion.

It was held also in the same case, that it is competent to impeach the credit of a witness by proof that he has made statements inconsistent with the testimony given on the trial. And accordingly we find it laid down in Greenleaf, *ubi supra,* that it is not irrelevant to inquire of the witness whether he has not on some former occasion given a different account of a matter of fact *to which he has already testified,* in order to lay a foundation for impeaching his testimony by contradicting it. These expressions in the opinion and authority referred to *"the testimony given on the trial," "to* which he has already testified," point out the distinction between collateral matter introduced upon the cross-examination, to lay a foundation for impeaching his testimony by contradicting the witness, and matter which he has

testified to in his examination in chief, introduced by himself, and stated to the jury as part of his own narrative of the transaction."

Instruction "B," as offered, and instructions 2, 3 and 4, as given by the court, were each objected to. As they each involve more or less the same question, they may be considered together.

By an Act of Congress passed February 13, 1893, (U. S. Comp. St. p. 2946), commonly known as the "Harter Act", the common law rule of the liability of carriers by water was materially changed.

By section 3 of that act it is provided: "That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America, shall exercise due diligence to make the said vessel in all respects seaworthy, and properly manned, equipped, and supplied; neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation, or in the management of said vessel; nor shall the vessel, her owner or owners, charterers, agent or master be held liable for losses arising from dangers of the sea, or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of the package or seizure under legal process, or for loss resulting from any act or omission of the shipper, or owner of the goods, his agent, or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The evidence tends to show that the steamer *Old Point Comfort* was seaworthy in all respects when she left Baltimore on her regular trip and was in the same condition when she left Callis' wharf, from which the

plaintiff's fish were shipped, and that her stranding resulted from faults or errors in navigation, or in the management of the vessel, or from dangers in the stream. If these facts were established, then the defendant was not liable under the Harter act for any damage to the plaintiff's fish resulting from the grounding of the steamer unless the defendant, after the grounding, failed to exercise a reasonable degree of skill and diligence, under all the circumstances, to preserve and forward the fish to their destination. This is conceded by the plaintiff in his instruction "B," which is as follows:

"The court instructs the jury that if they shall believe under the evidence that the delay caused by the grounding of the steamer Old Point Comfort was excusable under the law as set out in these instructions, yet the law made it the duty of the carrier to use a reasonable degree of care and diligence to preserve the goods of the plaintiff, without suspending or delaying its voyage, and unless the jury shall believe that the carrier did this they should find for the plaintiff."

The defendant by its instructions 2, 3 and 4, as offered, denied all liability if the grounding of the vessel was excusable under the Harter act; but the court refused to give either of the defendant's instructions as offered, but added to each the words, "unless the jury shall believe from the evidence that the company (the defendant) did not use a reasonable degree of care and diligence in preserving the plaintiff's goods."

The said instructions of the defendant, as offered, were clearly erroneous. While the Harter act relieves the owner of a stranded vessel from liability if he brings himself within the provisions of the act, it does not relieve him, after such stranding, from the exercise of a reasonable degree of skill and diligence under all the circumstances of the case in preserving and caring

for the shipper's goods. 2 Hutchinson on Carriers (3rd ed.), sec. 646. The court, therefore, did not err in refusing to give instuctions 2, 3 and 4, as offered.

As amended and given, did they correctly propound the law applicable to the facts of the case? It is not clear from the addition made by the court whether the reasonable care and diligence required of the defendant in preserving the plaintiff's goods referred to the whole voyage, or only after the stranding of the vessel. The court doubtless intended by the addition made to each of said instructions that it should be applicable alone to the duty of the defendant after the stranding of the vessel.

As the judgment will have to be reversed on other grounds and the case sent back for a new trial, it is sufficient to say that if instructions like the plaintiff's instruction "B" and the defendant's instructions 2, 3 and 4 are offered, they should clearly show that the care and diligence required of the defendant in preserving and forwarding the plaintiff's fish applied only to its conduct after the stranding of the steamer.

Instruction "C" asked for by the plaintiff and given by the court told the jury that if they believed the plaintiff was entitled to recover under the law and the evidence, the measure of the plaintiff's damages was the market value of the fish as of a time of a reasonable delivery, less the freight charges thereon.

There was evidence tending to show that the consignees were notified when the delayed cargo would arrive at the wharf in Baltimore, that they were present when the fish were unloaded to be taken away by them; that after some delay they notified the defendant that they would not receive the fish; that within an hour afterwards, between five and six o'clock that evening, a health officer of the city of Baltimore came to the wharf,

claimed the right to inspect and did inspect the fish during the following night, condemned the greater part of the cargo as worthless, and among such condemned fish were those of the plaintiff. The evidence does not satisfactorily show what was the condition of the fish when unloaded upon the wharf at Baltimore, though there is evidence that some of the boxes which were opened about an hour after the arrival of the steamer were in good condition, and that the reason given by the consignees for not receiving them was on account of the delay and not on account of the condition of the fish when tendered to them. If the fish, when delivered on the wharf at Baltimore, were worthless or in such condition that they would become so before they could be disposed of in the market by the exercise of reasonable care and diligence, and the plaintiff was entitled to recover, then instruction "C" properly states the measure of his damages; but if when the fish were placed on the wharf at Baltimore they were damaged, but not so damaged as to render them unfit for the market, the consignees ought to have received them and sold them for the best price obtainable, then the plaintiff's measure of damages would have been the difference between the value of the goods at the time of a reasonable delivery and the price for which they were sold in the market after deducting from such price any extra expense in selling the fish. In this view of the case the instruction was erroneous. Of course, if after the consignees refused to receive the fish the defendant could have made sale of them, it should have done so. Hutchinson on Carriers, sec. 669. But it is apparent from the evidence that after the consignees notified the defendant they would not receive the fish, the defendant could not have made sale of the fish before the health officer appeared and claimed the right to inspect and subsequently condemned them.

The Court erred in giving instruction "C," and ought either to have refused to give it, or so amended it as to cover both phases of the case as to the measure of damages.

The refusal of the court to give instruction No. 5 offered by the defendant is assigned as error. It is as follows:

"The court instructs the jury that it was the duty of the commission men to whom plaintiff's fish were consigned to receive the said fish, even though they had been damaged by delay in transportation, and if the jury believe from the evidence that the said commission men refused to receive said fish because they had been damaged or delayed in delivery, or for any other insufficient reason, and the said fish thereby became a total loss to the plaintiff, then the defendant company cannot be held responsible, and the jury are instructed they must find for the defendant."

That instruction was properly refused. If the fish arrived at Baltimore in a damaged condition, caused by the failure to exercise reasonable care and diligence in transporting them, then, although the goods may have become a total loss by reason of the failure of the consignees to receive them, still the defendant was liable in damages for the difference between the value of the goods if delivered in a reasonable time and their value when delivered or placed on the wharf in their damaged condition; and was not, as the instruction states, relieved of all liability because the consignees may have failed in the performance of their duty.

The remaining assignment of error is to the refusal of the court to set aside the verdict as contrary to the law and the evidence. As the evidence may be different at the next trial, it is unnecessary to consider that assignment of error.

For error in giving instruction "C" the judgment must be reversed, the verdict set aside and the cause remanded for a new trial to be had not in conflict with the views expressed in this opinion.

*Reversed.*