**Richmond**

ROBERT OWEN MAYNARD

v.

COMMONWEALTH OF VIRGINIA

No. 1161-87-2

Decided December 18, 1990

438

COUNSEL

Robert J. Rice (Bremner, Baber & Janus, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

## ON REHEARING EN BANC

OPINION

COLE, J.—In *Maynard v. Commonwealth*, 10 Va. App. 15, 389 S.E.2d 910 (1990), a panel of this Court found the evidence insufficient to sustain Maynard's conviction of breaking and entering with intent to commit larceny, reversed the conviction, and dismissed the indictment. The panel also reversed the convictions of rape and forcible sodomy and remanded these offenses with leave to retry. We granted the Commonwealth's petition for a rehearing *en banc* based upon the provisions of Code § 17-116.02(D). The issues on appeal are: (1) whether the trial court unreasonably limited appellant's counsel's right to cross-examine and impeach the Commonwealth's witnesses; and (2) whether the evidence was sufficient to establish beyond a reasonable doubt that the appellant entered the victim's dwelling house with the intent to commit larceny. We affirm the rape and forcible sodomy convictions; we reverse the conviction for breaking and entering with the intent to commit larceny.

On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it. *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988); Code § 8.01-680.

When so viewed, the evidence in the record establishes that on August 14, 1986, before going to bed at 1:30 a.m., the victim latched the front screen door to her brick rancher home but left the front door partially open for ventilation. At approximately 3:00 a.m., she suddenly woke up when she felt her bed move. An intruder placed his hand over her mouth and told her to "shut up,

you should not have woken up." For the next two hours, the victim was raped several times and sodomized.

During this ordeal, the bedroom was lit by the light of a digital clock on the night stand. The victim was able to see the silhouette and build of her assailant. She observed that the intruder had shoulder length hair and a mustache. He called her by her first name and revealed that he knew about tattoos on her body and placed his hand on two of them, one on the back of her right shoulder and the other in the middle of her back. These tattoos were not visible except when she wore a bikini type bathing suit to cut grass around her house. Two or three weeks prior to the night of the assault, the victim observed the defendant, who lived next door to her with his father, watching her as she cut her grass. The assailant also knew that she did not smoke cigarettes. As the night wore on, the victim became more certain that her attacker was the defendant. After he left around 5:00 a.m., the victim telephoned her father and sisters for assistance. She went to the police precinct at 5:45 a.m.

The Henrico County Police Department was organized into sections, Crimes Against Persons and Crimes Against Property. Detective Richard I. Valentine was a member of the "Property" section. Because the night of August 13, 1986, was a busy one for the "Persons" section and all of its investigators were handling unrelated homicides elsewhere in the county, Valentine was temporarily assigned by his supervisor to investigate the present rape case.

At 8:30 a.m. on August 14, he arrived at the precinct to start his investigation. He discussed the case with Officer J.R. Tucker, who had taken a preliminary investigative report on the incident from the victim and had briefly interviewed her. Valentine took the victim to MCV Hospital, where a routine physical examination for rape victims was made. Upon completion of the examination, he went with the victim to her home to view the crime scene. At her home, Valentine only viewed the crime scene because another officer had already tried to obtain fingerprints and had taken pictures. The victim had told the police she was almost sure that the defendant was the assailant. Later, she saw the defendant at his father's home cutting grass. Detective Valentine interviewed the defendant that afternoon, and Maynard told the detective that he had been at home between 2:00 a.m. and 9:00 a.m. on the

night in question. Valentine did not attempt to get an arrest warrant.

The next day, August 15, the case was permanently reassigned to Detective George E. Ross, Jr., who interviewed the victim at work and took her to the house to recover a cigarette butt left by the assailant. She told him that she was 99.9 percent sure that it was the defendant who did it, but would be 100 percent sure if she could hear his voice. On August 19, Ross instructed her not to have any contact with the defendant, since he was preparing a voice line-up. However, on August 23, she called defendant's father's house to speak with the father on an unrelated matter and the defendant answered the telephone. She instantly recognized the voice as her assailant's. Four days later the police obtained warrants for defendant's arrest.

Maynard was charged in three indictments of rape, forcible sodomy, and common law burglary on or about August 14, 1986. On February 11, 1987, a jury was impaneled and evidence taken, but the jury was discharged and a mistrial declared because the jury was unable to reach a verdict. On August 11, 1987, a second jury trial commenced. The jury found Maynard guilty of all charges and imposed sentences of twenty years each on the rape and sodomy charges and five years on the burglary. This appeal followed.

Maynard contends that the trial court erred in refusing to allow his counsel to cross-examine fully and impeach the Commonwealth's witnesses. Specifically, Maynard claims that the trial court erroneously restricted his cross-examination of Detective Valentine. He further asserts that his counsel should have been permitted to examine the victim as to her awareness that a tattoo of a crescent moon with stars surrounding it on her body was considered in some circles to be a symbol of the devil.

To understand Maynard's contention that he was not allowed to impeach the testimony of Detective Valentine, one must understand the factual circumstances under which the issue arose in the first trial. At the first trial, Detective Valentine was examined by the Commonwealth's attorney, without objection, about whether he placed Maynard under arrest, whether he "figured" he had sufficient evidence to place him under arrest, whether he would have felt "comfortable" arresting him at that point, and what he

would have wanted to make the arrest. Thereafter, defense counsel extensively cross-examined Valentine about the function of a preliminary hearing, the arrest, and the requirements to prove probable cause, culminating in the following exchange:

Q. You didn't arrest Bobby Maynard on the 14th of August, true?

A. That's correct.

Q. Was that reason because it was going to be assigned [to another detective] or because you didn't have enough evidence, or both?

A. Both.

This totally irrelevant evidence was produced at the first trial without objection from anyone. The trial court did not intervene. The evidence served only to distract the jury from the main purpose of the trial, which was to determine the guilt or innocence of the defendant. *See Brown v. Commonwealth*, 3 Va. App. 182, 185-86, 348 S.E.2d 849, 851 (1986).

During the second trial, Valentine's relevant testimony concerning the actual facts of his investigation was identical to his testimony in the first trial. In response to questions by the Commonwealth's attorney, without objection from the defendant, Valentine again testified that he did not place Maynard under arrest, did not secure an arrest warrant for him, and had not gone to a magistrate in an attempt to get a warrant after the interview with the victim on the morning of August 14, 1986, or after the interview with Maynard in the afternoon. In response to the question, "Why not?" Valentine said:

I had taken the information from [the victim]. I had evaluated what she had told me but mostly because at that point, as I said before, I was involved in this matter only temporarily. I was given orders as to what to do and that is what I was going to do unless something drastically happened. My intentions when I responded out to the Dabbs House to speak to [the victim], and during this whole investigation was only to keep things in a holding pattern until a Crimes Against Persons investigator could become involved.

Unlike the first trial, in the second trial the Commonwealth's attorney did not ask any questions about "probable cause." The following exchange between defense counsel and Valentine constitutes the basis for the problem we address:

Q. Are you familiar with the term Probable Cause, Det. Valentine?

A. I am familiar with the term, yes, sir.

\* \* \*

Q. When you go before a Magistrate and tell the Magistrate I would like an arrest warrant for anybody, you are swearing under oath, 1: that you have a reasonable belief that a crime has been committed? 2: that a reasonable belief that x committed the crime; is that correct?

A. Exactly.

Q. Did you not have that reasonable belief in this case? Did you, Det. Valentine?

A. Mr. Rice, I was not there at that point looking for that reasonable belief. I was not. My function was not to try and find that reasonable belief.

Q. I understand but based on the information you had from your interview with [the victim], from your information from Mr. Tucker, from your interview with Bobby Maynard, from everything that you know about this case, you did not feel that you had probable cause to make an arrest in this case, did you?

Although the Commonwealth's attorney made no objection, the last question was never answered. The trial judge intervened, excused the jury, and held a discussion with counsel.

The trial court would not permit the witness to answer the question, but allowed the defendant to "ask Detective Valentine if you want to, why he did not arrest Mr. Maynard." He refused to permit the defendant to ask Valentine: "Did you not make an arrest because the case was going to be reassigned to somebody else, or, (2) because you did not have enough information, or both?" The purpose of the question was to lay a foundation to impeach Valentine. Since Valentine gave two reasons for his failure to arrest in the first trial and only one in the second trial, the defend-

ant argues that he was denied the right to impeach Valentine on the basis of contradictory responses. He contends that he had an absolute right to cross-examine the witness on any relevant matter which was put in issue on direct examination by the Commonwealth.

Maynard argues that he was entitled to ask the same questions at his second trial as were asked at the first trial. The trial court properly rejected this argument because the information sought from the witness was irrelevant to the issue. No rule of law requires a trial court to repeat errors made in previous trials. *See Harmon v. Commonwealth*, 212 Va. 442, 445-46, 185 S.E.2d 48, 51 (1971).

■■■ Cross-examination of prosecution witnesses "is 'fundamental to the truth-finding process and is an absolute right guaranteed to an accused by the confrontation clause of the sixth amendment.' A trial court, however, 'may exercise discretion to see that the right is not abused [once] the right to cross-examine has been fairly and substantially exercised.'" *Williams v. Commonwealth*, 4 Va. App. 53, 77-78, 354 S.E.2d 79, 93 (1987)(citations omitted). "Subject to such reasonable limitations as the trial court may impose, a party has an absolute right to cross-examine his opponent's witness on a matter relevant to the case, which the opponent has put in issue by direct examination of the witness." *Basham v. Terry*, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958).

■■■ However, the defendant's right to cross-examine witnesses does not extend to collateral and irrelevant matters. A witness cannot be impeached by evidence of a collateral fact which is not relevant to the issues of the trial, even though to some extent it has a bearing on the issue of credibility. *See Harold v. Commonwealth*, 147 Va. 617, 622, 136 S.E. 658, 660 (1927). In *Seilheimer v. Melville*, 224 Va. 323, 295 S.E.2d 896 (1982), the Supreme Court stated the general rule to be:

> No question respecting any fact irrelevant to the issue can be put to a witness on cross-examination for the mere purpose of impeaching his credit by contradicting him. And if any such question be inadvertently put and answered the answer of the witness will be conclusive . . . he cannot be asked as to any collateral independent fact merely with a view to contradict him afterwards by calling another witness.

*Id*. at 326-27, 295 S.E.2d at 898. "The test as to whether a matter is material or collateral, in the matter of impeachment of a witness, is whether or not the cross-examining party would be entitled to prove it in support of his case." *Allen v. Commonwealth*, 122 Va. 834, 842, 94 S.E. 783, 786 (1918).

Here, the defendant did not challenge the legality of his arrest. Hence, whether probable cause existed to arrest the defendant was irrelevant to the issue of guilt or innocence. Maynard could not have presented evidence on these issues in support of his case. Therefore, they were collateral issues and the trial court did not err in refusing to permit cross-examination upon them. The specific question asked by defense counsel was clearly inappropriate for a number of reasons. Valentine's belief as to the existence of probable cause to arrest was irrelevant to the issue of guilt or innocence of the defendant. Moreover, the information that Valentine had received from the victim and the defendant was contradictory. The question required the detective to resolve the conflicts in the evidence. We find no error in the rulings of the trial court excluding this evidence.

Since the trial judge would not permit the defendant to ask the same questions concerning "probable cause" that counsel had asked in the first trial, defense counsel proffered for the record the questions he proposed to ask and the responses Valentine had given when asked the same questions in the first trial. The proffered questions and answers are as follows:

(1) Q. Did you place him under arrest at that time?

A. I did not.

(2) Q. Did you figure you had sufficient evidence at that point, to place him under arrest?

A. I did not.

(3) Q. Would you have felt comfortable arresting him at that point?

A. I would not have.

(4) Q. What would you have wanted to do if you were investigating the case, to abide by the arrest?

A. I would have wanted more probable cause than I had at that particular point. And once, again, I did not

feel that I had it. Also, once again, it was not my matter.

(5) Q. In your experience, when you have a victim, regardless of what type of case it is, tells you that they positively identify somebody, you obtain a warrant for their arrest, do you not?

A. Most of the time. Most of the time. And I will only clarify that by saying that it depends on the victim, or it depends on the witness, but I would say in most of the time, yes, I would go ahead and obtain a warrant.

(6) Q. If you were not sure about what the victim has said, then that would cause you not to obtain a warrant, isn't that correct?

A. I would say if I had some doubts about the victim, or the witness.

Question one was answered by Valentine on direct examination. Questions two, three and four were inappropriate because what Valentine "figured," what he would have felt "comfortable with," and what he would have "wanted" if he were investigating the case, were irrelevant to the issues in the case. Questions five and six were inappropriate for the same reasons. The trial court did not commit error by refusing to permit the defense to ask these questions.

Maynard next argues that because the victim had sworn on a bible to tell the truth, an inquiry into the victim's possible satanic belief was relevant to impeach her truthfulness. We find no error in the court's ruling to limit examination of the victim concerning the meaning of certain tattoos on her body and her beliefs.

At trial, the victim testified that during the attack, the intruder revealed knowledge of the presence and location of tattoos on her body. She described one of these tattoos as a crescent moon with stars surrounding it. Defense counsel informed the trial judge that his cross-examination of the victim would include the following:

His Honor will recall she testified previously, and I am going to lay a foundation, she said that several years ago she had gotten away from the Christian faith and that is when she got these tattoos, ten years ago. She described the one with

the crescent moon and the stars. I intend to ask her if she is aware that that is the symbol of a Satan. I have contacted a tattoo parlor and I think that she has taken an oath to testify to tell the truth, so help me God, and she has testified at one point in time that she has gotten away from the Christian faith. I think I am entitled to question her as to the relevance of that.

The trial judge refused to allow this inquiry but allowed defense counsel "to ask her what significance, if any, she has attached to [the tattoo]."

The record of the cross-examination of the witness reflects that she testified that she was not aware of the significance of the symbols:

Q. It is a crescent moon with some stars around it; is that correct?

A. Yes, sir.

Q. Does that have any significance to you?

A. Not besides the fact that I thought it was attractive when I picked it out.

Q. That is the only significance it has to it?

A. Yes, sir.

Q. You testified, did you, that you got those tattoos about the time that you started getting away from being a Christian; is that correct?

A. Not away from being a Christian, but a little rebellious and going out and staying out late.

Q. If I told you that your statement on February 11th was that, I had gotten away, I had been raised a Christian and I had gotten away from it, is that true or not true?

A. That is true.

Q. That is the time you got the moon with the stars?

A. Yes, sir.

In view of the victim's professed lack of knowledge concerning the tattoo symbol and in the absence of a proffer on the record of the further evidence sought to be introduced, *see Barrett v. Commonwealth*, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986), we con-

clude that the trial judge did not err in limiting the examination of the victim concerning her beliefs.

■ Assuming that the trial court did commit error in ruling upon the evidentiary issues, the rulings clearly were harmless. The United States Supreme Court held in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Id.* at 684. Under the Court's reasoning, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, the reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.*; *see also Shanklin v. Commonwealth*, 222 Va. 862, 864-65, 284 S.E.2d 611, 612-13 (1981); *Williams v. Commonwealth*, 4 Va. App. 53, 78, 354 S.E.2d 79, 93 (1987).

■ Factors cited in *Van Arsdall* as important to the harmless error inquiry are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and . . . the overall strength of the prosecution's case." 475 U.S. at 684. Valentine's testimony was insignificant to the prosecution's case. He was only involved in the investigation for *one day* and had made it clear on numerous occasions that he was involved on a temporary basis until an investigator from the "Persons" section became available. Valentine met the victim at Dabbs House on the morning of August 14, 1986. The only substantive testimony he gave about the meeting was that the victim was nervous and upset. Valentine's testimony was not adverse to Maynard because Maynard did not dispute that the victim had been raped. Maynard's defense was that he did not do it. The fact that she was upset and nervous was corroborated by Dr. Richard Rinehardt at MCV Hospital, Henrico County police officer J.R. Tucker and several members of the victim's family.

Valentine took the victim to MCV Hospital to be physically examined by Dr. Rinehardt. Valentine testified that he took no part in the examination and was across the hall in a separate room. Valentine gave no testimony concerning the physical examination, except to say that one had occurred. After the physical examina-

tion, Valentine went with the victim to her home to look at the crime scene. He did not testify concerning anything of significance learned on this visit. He testified that the only thing he did was to look since Detective Thomas M. Tiller had already been to the home and had tried to obtain fingerprints and take pictures. This testimony was not adverse to Maynard.

Valentine's next involvement occurred about 3:00 p.m. when the victim called and advised Valentine that Maynard was at home next door cutting grass. She wanted someone to come and interview him. Valentine, out of a sense of duty, went to Maynard's home and discussed the matter with him. At trial, Valentine was shown a photograph taken of Maynard on September 2, 1986, at the time of arrest. Valentine testified that in the photograph Maynard looked as he had looked at the interview on August 14, 1986. This testimony certainly was not adverse to Maynard, since there was no dispute that the photograph was, in fact, of Maynard. The victim also testified that the photograph was that of Maynard as he looked on August 14, 1986. The photograph was introduced through Detective Ross, who said he took it on September 2, 1986, at the time of Maynard's arrest. Jack Maynard, the defendant's father, was shown the same photograph and, after acknowledging that his son always had long hair and a mustache, testified that the picture looked "normal to me."

Concerning the interview, Valentine testified that he asked Maynard to account for his whereabouts the previous night. According to Valentine, Maynard answered that he had come home about 2:10 a.m., went to bed, stayed in the house until about 9:30 a.m., got up, and went with Barry Foreman to the Last Chance restaurant. The only other evidence in the case concerning Maynard's activities came from Detective Ross who testified that Maynard told him that on the night in question he had left the Pit Stop about 2:15 a.m. and "bummed" a ride home, a distance of about six to eight miles, with a man at the bar. There is nothing in the record to dispute that these statements were in fact made to the officers.

Other factors specified in *Van Arsdall* for consideration are the presence or absence of evidence corroborating or contradicting the material points of witness' testimony. The only issue in the case was whether the defendant was the one who committed the rapes and sodomy. At trial, the victim positively identified Maynard as

her assailant. As further support for the accuracy of her identification, she testified that she could see well enough during the attack to discern a mustache and could see the silhouette and the body build of her assailant. She further testified that at one point during the incident he said: "Donna, I like you, and I know who you are." At another time he said: "I am going to have to kill you. I know you know who I am." He also said: "I know you have got a tattoo here and I know you have got a tattoo here" and he put his right hand on the tattoo marks without looking at the locations. Maynard told Detective Ross that he knew the victim only by her first name, Donna. She testified she wore bathing suits, shorts and shirts in her yard when cutting her grass, which exposed her back from time to time, and that Maynard, only several weeks prior to the incident, had the opportunity to observe them.

The Commonwealth's case was further strengthened by the victim's testimony that when the assailant left her home after the rape at 5:00 a.m., he said he had to be somewhere in twenty minutes. Maynard's father, Jack Maynard, testified that he had to wake his son at 5:20 a.m. for him to get ready for work.

Additional corroboration of the Commonwealth's case is found in the testimony of Mary Jane Burton, supervisor of the Serology Section at the Bureau of Forensic Science for the State of Virginia. She examined and compared samples of blood and body secretions, hair and fibers taken from the victim and Maynard. Although Burton could not tell from her comparisons whether Bobby Maynard committed the crimes, she could conclude from her examinations of the blood, body secretions, hairs and natural fibers whether Maynard was within a group of persons who could be included or excluded from the group of persons who could have committed the acts. She testified that Maynard was included. Her testimony showed that the victim has type A blood and Maynard has type O blood. She described a masking phenomenon that makes type A blood more powerful and hides type O blood. Immediately after the assailant performed oral sodomy on the victim, he smoked a cigarette and left the butt on the window sill in the bedroom. Secretions on the butt disclosed the existence of type A blood. If Maynard had smoked the cigarette, one would have expected to find type O blood. Burton testified about the transfer of body fluids and if secretions occurred during the act of oral sodomy, the victim's secretions would combine with the assailant's

saliva, and type A blood would be found on the cigarette butt.

Burton also examined hairs that were taken from the victim's bedsheets. Two of the head hairs and three pubic hairs were consistent with samples of hair taken from Maynard. Burton explained that she looked at fifteen characteristics and in order to say that the hairs samples were consistent, the unknown hair needs to fit within the range of the person's known hair.

Detective Valentine did not contribute any testimony that had any bearing on the identification of Maynard as the criminal agent in this case. Therefore, even if the trial judge had permitted the defendant to answer the questions proposed, an impeachment of Valentine would have had no effect upon the outcome of the case. The deletion from the record of Valentine's testimony does nothing to undermine the strength of the Commonwealth's case.

As for the lighting conditions, "[t]he bedroom was only faintly lit by the light of a digital alarm clock on the night stand." The victim testified that when Maynard entered her bedroom sometime after 3:00 a.m., there was light in the room from the digital clock. She said the room was partially dark, which would imply that it was also partially light. According to her testimony, she "could see enough to know a mustache and the silhouette, and the body and the build." At this time, she admitted that she did not get "a detailed shot of the face." However, she observed "the silhouette with the haircut and the mustache and I never could have given an eye color or birthmark or anything like that."

She further testified that by 5:00 a.m. her eyes had become adjusted to the darkness and as morning approached, the house got lighter. Evidence in the record discloses that, in addition to light from the moon and the sun, there was a street light directly in front of the house thirty to forty yards away and directly behind the house, there was a service station with lights. Maynard left the bedroom shortly before 5:00 a.m., presumably to leave the house. He returned in a minute or two and the victim testified that she got her best glimpse of him when he came through the hallway and walked over to her bed. In fact, Maynard commented that he had to leave because "it is getting light." Upon this evidence, the jury was entitled to conclude that the lighting in the room was sufficient for the victim to identify the defendant.

Later in the morning of the crime as the victim searched through her purse for a telephone number to report her absence from work, she discovered that $80 was missing from her wallet. The wallet was described as a man's folded wallet wrapped with a rubber band. The purse containing the wallet was on the floor beside the dresser in the victim's bedroom during the attack.

■ Where, as in this case, "an indictment charges an offense which consists of an act combined with a particular intent, proof of the intent is essential to conviction." *Patterson v. Commonwealth*, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). Although the Commonwealth may prove by circumstantial evidence the specific intent to steal, that proof must be, as in all criminal cases, beyond a reasonable doubt. *Jones v. Commonwealth*, 3 Va. App. 295, 299, 349 S.E.2d 414, 417 (1986).

The circumstantial evidence in this record fails to support an inference beyond a reasonable doubt that the intruder entered the victim's dwelling with the intent to commit larceny. The evidence established that the intruder entered the victim's dwelling sometime between 1:30 a.m. and 3:00 a.m. by cutting through the front door screen. He then assaulted the victim over the course of the next two hours. These circumstances, standing alone, reflect an intent to rape or ravish rather than an intent to steal from the victim.

The Commonwealth argues, however, that Maynard's intent to commit larceny may be inferred from the fact of the completed crime. *See Smyth v. Morrison*, 200 Va. 728, 734, 107 S.E.2d 430, 435 (1959)("Where larceny has actually been committed that is the best evidence of the intent with which the breaking was committed"). To conclude on the record before us that a larceny in fact occurred, however, would require speculation. The most that was proved or that reasonably can be inferred from the evidence is that a sum of money was discovered missing from the victim's wallet on the morning after the assault. Even if we were to assume from this evidence that the money was stolen rather than misplaced, the evidence nevertheless fails to exclude the reasonable hypothesis that someone other than the intruder took the money on another occasion. By her own admission, the victim could not recall the last time she had seen the money. She further acknowledged that she did not keep her purse in a secure place while at work.

■ Other facts in the record render improbable the Commonwealth's theory that the intruder intended to steal and did steal the money before raping the victim. According to the victim's testimony, the bedroom was quite dark. The wallet had been wrapped several times with a rubber band and tucked inside her purse on the floor. When she retrieved her purse from its resting spot the morning after the attack, she noticed nothing unusual about its appearance. Neither the purse nor the wallet bore any obvious signs of tampering. Furthermore, nothing else in the victim's home was moved or reported missing. On this evidence, the trier of fact could find an intent to commit larceny only by resorting to surmise and speculation. *See Patterson*, 215 Va. at 699, 213 S.E.2d at 753. "Whenever the evidence leaves indifferent which of several hypotheses is true, or merely establishes only some finite probability in favor of one hypothesis, such evidence does not amount to proof beyond a reasonable doubt." *Sutphin v. Commonwealth*, 1 Va. App. 241, 248, 337 S.E.2d 897, 900 (1985). We, therefore, reverse the conviction for breaking and entering with intent to commit larceny.

In summary, we find the evidence insufficient to sustain the conviction of breaking and entering with intent to commit larceny. We, therefore, reverse the conviction and dismiss the indictment as to that charge. We affirm the rape and forcible sodomy convictions.

*Affirmed in part,*
*reversed in part.*

Koontz, C.J., Baker, J., Barrow, J., Coleman, J., Keenan, J., and Moon, J., concurred.

Benton, J., dissenting.

The right of cross-examination is fundamental to the truth-finding process and is an absolute right preserved to the accused by the constitutional guarantee of confrontation. *Barrett v. Commonwealth*, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986); *Moore v. Commonwealth*, 202 Va. 667, 669, 119 S.E.2d 324, 327 (1961). The trial judge may exercise discretion to prohibit the abuse of cross-examination, but this discretion may only be employed after the right to cross-examine the witness has been substantially and fairly exercised. *Barrett*, 231 Va. at 108, 341 S.E.2d at 194.

"Subject to such reasonable limitations as the trial court may impose, a party has an absolute right to cross-examine his opponent's witness on a matter relevant to the case, which the opponent has put in issue by direct examination of the witness." *Washington v. Commonwealth*, 228 Va. 535, 549, 323 S.E.2d 577, 587 (1984), *cert. denied*, 471 U.S. 1111 (1985).

In upholding the trial judge's limitation on Maynard's right to cross-examine, the majority glosses over the significance of Detective Valentine's testimony on direct examination. As our Supreme Court stated in *Baltimore, Chesapeake & Atlantic Ry. v. Hudgins*, 116 Va. 27, 81 S.E. 48 (1914), "it is not irrelevant to inquire of the witness whether he has not on some former occasion given a different account of a matter of fact *to which he has already testified*, in order to lay a foundation for impeaching his testimony by contradicting it." *Id.* at 32, 81 S.E. at 49. This is so even though the matter is collateral or immaterial to the issue in the case. *Id.* at 31, 81 S.E. at 49; *see also Avocet Dev. Corp. v. McLean Bank*, 234 Va. 658, 668-69, 364 S.E.2d 757, 763 (1988). The majority fails to perceive "the distinction between collateral matter introduced upon the cross-examination, to lay a foundation for impeaching [the witness'] testimony by contradicting the witness, and matter which [the witness] has testified to in [the] examination in chief, introduced by [the witness], and stated to the jury as part of [the witness'] own narrative of the transaction." *Hudgins*, 116 Va. at 32-33, 81 S.E. at 49. The latter is a permissible form of proof; the former is not. *Id.* at 32, 81 S.E. at 49.

On four occasions during direct examination, the Commonwealth asked the detective why he did not arrest Maynard. Although the detective had previously testified under oath that he had two reasons for not arresting Maynard, on this examination the detective gave only the reason that he was in a "holding pattern" waiting for another investigator to arrive. Thus, despite the detective's prior sworn testimony that he did not arrest Maynard because he did not believe he had sufficient evidence, the Commonwealth, through its questions on direct examination, sought to convince the jury that the detective did not arrest Maynard because the detective was awaiting assistance from other officers. Maynard's attempt to impeach the detective's testimony was within the scope of proper cross-examination. *See Hudgins*, 116

Va. at 32, 81 S.E. at 49.

Moreover, the majority fails to appreciate the importance that the Commonwealth placed on the detective's role in this case and the significance of his testimony when this case was tried before the jury. The Commonwealth first made the detective's role a central issue during its opening remarks to the jury:

[The victim] tells the police officer she talked to that [the assault was committed by] Bobby Maynard. Henrico Police — such a case as this, serious felony charges, would be assigned to a detective in the Crimes Against The Person's section. There are a couple of basic sections in the Detective Bureau here. One is Crimes Against Property and one is Crimes Against Persons, and Crime Against Persons obviously is homicide, rapes, robberies and violence to the person. That is what this is. Crimes Against Property. Break-in and larceny, another piece, different types of cases, involved with a violent person.

That particular morning on August 14th, when she went to the East End Dabbs House, Henrico County Police did not actually have a detective on Crimes Against Persons available to meet with her. . . . They were not available . . . So, what did they do? The Police assigned Detective Rick Valentine, an experienced detective, who is in Crimes Against Property, to go out and meet with [the victim] at the Dabbs House and to find out basically what happened, and do the preliminary things that are necessary to maintain the integrity of the case to pursue things that need to be done like getting her to a doctor and things like that. Until the proper investigator for Crimes Against Persons can be assigned or reassigned. The time of that reassignment is unknown. It could be any time that day or maybe the next morning, but as soon as someone could be freed, okay, so, Valentine talks to her and takes her down to MCV Hospital where she is examined by Dr. Rinehardt.

\* \* \*

[A]fter she has been raped, she sees Robert Owen Maynard. The sister sees him first. Robert Owen Maynard was out in his yard next door in Jack Maynard's yard cutting the grass. They can't believe it. He is out there, bold as

brass, cutting the grass. They called the police and Det. Valentine and they speak with Valentine and he comes out there to speak to Mr. Maynard. He advises him of his Constitutional rights and to get the statement from him about were he was the night before, but remember here, Det. Valentine is not looking really to make an arrest in this particular case. There is a lot that goes into making a case that is prosecutable and winnable so that you can convict a person in court. Things need to be done. He is not doing that because that is not his major orders from superiors. He is trying to protect the case until it is reassigned and he has not, Mr. Maynard is not arrested, although [the victim] has said that, I believe it is Bobby Maynard. There are some things that the police want to check on.

In its case-in-chief, the Commonwealth offered direct testimony from the detective that he interviewed Maynard shortly after the victim told him Maynard raped her. The Commonwealth then elicited the detective's testimony that he did not arrest Maynard because he was only temporarily assigned to the case. The Commonwealth's Attorney knew the testimony was inconsistent with the detective's testimony at the first trial.[1]

The majority ignores the deceptive direct testimony and portrays defense counsel's cross-examination as an attempt solely to lay a foundation to impeach the detective. Although the cross-examination would have served the permissible purpose of impeach-

---

[1] At the previous trial, which ended in a mistrial because the jury was unable to reach a verdict, Maynard's counsel had asked the following questions of Valentine without objection from the Commonwealth

Q: Did you place him under arrest at that time (during the August 14, 1986 interview)?

A: I did not.

Q: Did you figure you had sufficient evidence at that point to place him under arrest?

A: I did not.

Q: Would you have felt comfortable arresting him at that point?

A: I would not have.

Q: You did not arrest Bobby Maynard on the 14th of August, true?

A: That is correct.

Q: Was the reason because it was going to be reassigned or because you did not have enough evidence or both?

A: Both.

ing the detective's testimony as to a fact to which the detective had testified on direct examination, *Hudgins*, 116 Va. at 32, 81 S.E. at 49, the cross-examination also would have established that the detective did not have information which warranted an arrest of Maynard even though he had extensively interviewed the victim and Maynard. The cross-examination would have exposed the deception that was perpetrated on the jury, thereby casting doubt on the strength of the victim's descriptions at the time of the incident.

The majority makes much of its conclusion that the detective did not give testimony adverse to Maynard. However, the trial judge's ruling, which the majority now sanctions, shielded the detective from giving evidence that tended to exculpate Maynard. The trial judge's restriction on the cross-examination of the detective may have caused the jury to assign more weight to his testimony than it otherwise might have done, thereby bolstering indirectly the victim's testimony.

In its harmless error analysis, the majority provides an extensive discussion of the reason why they believe the detective's testimony was irrelevant to the case. Although it should suffice to state that *Hudgins* controls the disposition of the question presented in this case, the harmless error analysis warrants a response. The majority paints the detective as a marginal participant in the investigation of the crime, characterizing his investigation of Maynard as being perfunctorily done "out of a sense of duty." The record establishes, however, that the detective conducted a thorough investigation of the incident on the day it occurred. He interviewed the victim and Maynard. His testimony on direct examination concerning his investigative efforts covers thirty-one pages of trial transcript. One of the consequences of limiting Maynard's cross-examination of the detective was to deprive the jury of the detective's testimony that he made an informed judgment not to arrest Maynard because he had not been convinced by the evidence at his disposal, including the victim's statement. That a police investigator with twenty-two years experience failed to arrest Maynard because he doubted the strength of the victim's story is not an irrelevant fact in a case where the proof was purely circumstantial.

Any harmless error analysis of this case must take into account the relative strength of the Commonwealth's case. In so doing, sig-

nificant weight must be given to the fact that this was the second time that Maynard had been tried. In the first trial, the jury failed to convict Maynard. The evidence in the second trial, which resulted in a conviction, differed from the evidence in the first trial in one respect — the limitation on the detective's testimony.

The prosecution was based entirely on circumstantial evidence. The victim's bedroom was dark. Although the majority speculates about the sources of light, the victim testified that the only light in the room came from a digital clock. The medical records from the hospital recount the victim's report that "the room was dark and I could not see his face." The record also reflects that the victim was near-sighted, with uncorrected vision of 20/300, and was not wearing her contact lenses. The victim further testified that she "could see enough to know a mustache and the silhouette, and the body and build . . . I never got a detailed shot of the face . . . and I never could have given an eye color or birthmark or anything like that." When asked if she saw a mustache, she responded: "I saw the silhouette of the face with the mustache." After the assault the victim gave varying estimates of her attacker's height. She described him as being as short as 5' 6" and as tall as 5'11." At trial it was established that Maynard was five feet seven inches tall.

The evidence also proved that a cigarette stub was found on the ground under the victim's window and another was found in her room. Both were "Winstons." Although Maynard was a smoker, he smoked "Marlboros." The victim, who said she had not smoked in several years, testified that the cigarette stubs found on the window sill and on the ground outside the window were not hers. She testified that her assailant smoked a cigarette during the assault. The laboratory report showed that the cigarette stub in the window had saliva indicative of a type A secretor. The cigarette stub found outside the window contained no "factors that would indicate a secretion type."

Because the victim reported that the assailant kissed her breasts, the hospital obtained samples of fluids from the victim's breast. Those samples also indicated fluids from a type A secretor. Maynard was a type O secretor. The victim was a type A secretor. Although none of the forensic evidence necessarily excluded Maynard from the universe of potential suspects, none conclusively linked him to the assault.

It is also significant that at trial the victim testified that she saw Maynard cutting his grass later on the day of the rape, but she admitted that she testified at the preliminary hearing that at no time after the rape did she see the man who raped her. She also testified that Maynard wore blue jeans while cutting the grass and that her attacker also wore blue jeans. The detective who interviewed Maynard while he was cutting grass that same day testified as follows:

A I can't say positively what he was wearing at that point when I arrived. For some reasons shorts sticks in my mind, but I would not be able to swear that he was definitely wearing shorts.

Q Let me ask you this: Do you recall my asking you on February 11th, he was wearing red shorts and you said that, I can't tell you? I recall shorts; I can't recall exactly what kind of clothing he had on, but I would recall the shorts. Do you recall saying that?

A I can't deny that I said that. No, sir.

\* \* \*

Q Then again on that same page, Mr. Martin, I asked you, he was not wearing blue jeans? Your answer: Long pants. I said, yes, sir. You said, not that I recall. You don't dispute the transcript on that either?

A Again, I do not dispute it.

Contrary to the suggestion that Maynard was the only person who may have seen her tattoo, the victim testified that a group of young men residing in a house across the street from her residence had seen her wearing a bathing suit while she was cutting grass. On several occasions while watching her, those men "did some whistles and catcalls." She testified that the men who reside in the house are in a range of age close to Maynard's age, wear jeans, and have long hair. She described them as "150 and 160, 5-9 and 5-10, long hair, color of hair, dark brown," the same description she gave of her attacker. One of the men who had whistled and made "catcalls" at her came to her door one day, offered her beer, and wanted to enter her residence. She said "No," to which he responded, "you mean you are not going to let me come in?"

Upon this circumstantial evidence, it cannot be said that the limitation on the Maynard's cross-examination was harmless error. In addition, having opened the inquiry on direct examination concerning the detective's failure to arrest Maynard and having allowed the detective to contradict his prior sworn testimony, the Commonwealth cannot now be heard to complain that the detective's reasons for not arresting Maynard were irrelevant to the issues in the case. By refusing to permit Maynard to cross-examine the detective on the discrepancy between his prior testimony and matters to which the detective testified during the Commonwealth's direct examination, the trial judge deprived Maynard of the fair exercise of his right of cross-examination. For these reasons and those stated in the panel decision, *Maynard v. Commonwealth*, 10 Va. App. 15, 389 S.E.2d 910 (1990), I would reverse the conviction of the rape and sodomy charges and remand for a new trial. I too would reverse the conviction of breaking and entering with intent to commit larceny and dismiss that indictment.