COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Annunziata and Overton
Argued at Norfolk, Virginia


TYRONE CHRISTOPHER SCOTT
                                              OPINION BY
v.   Record No. 2713-95-2      JUDGE ROSEMARIE ANNUNZIATA
                                            JUNE 17, 1997
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Robert W. Duling, Judge


            Craig S. Cooley for appellant.

            Robert H. Anderson, III, Assistant Attorney
            General (James S. Gilmore, III, Attorney
            General, on brief), for appellee.


     Following a jury trial, appellant, Tyrone Christopher Scott,

was convicted of second degree murder and robbery.  Appellant

contends that the trial court erred in limiting the scope of his

cross-examination of one of the Commonwealth's witnesses on the

issue of that witness' bias or motive to testify.  We find that

the trial court erred, but, under the facts of this case, we find

the error to have been harmless and affirm appellant's

convictions.

                              I.

     Zenobia Jones and Tamika Young testified for the

Commonwealth concerning the events in question.  They testified

that Jones, Young, Kimberly Taylor and appellant spent the day

drinking and taking drugs at Jones' home.  Joseph Ford joined the

group early the same evening.  During the course of the evening,

a dispute arose over Ford's payment for sexual acts he engaged in with Young.

Young had decided to forego payment when Taylor intervened and demanded that Ford pay Young. Taylor and Ford began fighting and eventually drew the attention of appellant, who was Taylor's ex-boyfriend. Together, appellant and Taylor fought Ford to the ground, where they continued to hit him. Ford was released when he agreed to pay, but shortly thereafter he ran away.

Taylor and appellant gave chase, caught up with Ford and resumed hitting him, this time more aggressively. Taylor hit Ford with a glass object as appellant held Ford down. Appellant and Taylor were trying to get money from Ford, which Ford held in his mouth. When it appeared Ford would not give her any money, Taylor "got mad" and stated, "shoot, forget it. I'm just going to kill him." Taylor went to the kitchen and returned with an object which she used to hit Ford while appellant continued to hold Ford down. Appellant resumed hitting Ford, stating he was going to get the money. Taylor continued hitting Ford and eventually strangled him with a belt. Appellant held Ford while Taylor strangled him. Ford fell to the couch, and appellant and Taylor dragged him outside. After returning inside, appellant gave Taylor some blood-stained money. Ford was killed in the course of the fight. Later that evening, appellant told his sister, "we just killed a dude."

Linwood Wiggins, Jr. also testified for the Commonwealth.

Wiggins testified that, while in jail, appellant told him he had beaten Ford in the head with an ashtray because Ford had $1,000. Wiggins further testified that he had been convicted of five or six felonies as well as misdemeanors involving stealing.

On cross-examination, Wiggins admitted that his criminal record reflected seven felony convictions. Wiggins also testified that he faced a pending sentencing proceeding on three felony charges in a different judicial circuit. Wiggins stated his understanding that the sentence he would receive for his recent convictions would likely relate to his prior convictions. Wiggins stated that although he was not "promised" anything, the Commonwealth had agreed to make Wiggins' sentencing judge "aware" of his cooperation. Wiggins agreed that he was testifying, hoping "they don't give me the 15 years the charges carry."

Appellant's counsel then attempted to ask Wiggins about the date and nature of each of his felony and misdemeanor convictions, but, upon the Commonwealth's objection, the court ruled that only inquiry into felonies and misdemeanors involving moral turpitude was relevant. In a subsequent proffer, appellant's counsel attempted to clarify his position. He argued that he was entitled to inquire into the number and nature of each of Wiggins' prior convictions on the theory that the nature of each of Wiggins' prior convictions would demonstrate the extent of his motive to testify against appellant, in the "hope" of receiving leniency at his forthcoming sentencing hearing. The

- 3 -

court was unpersuaded.

Although the court's initial ruling on the matter was not clear, it subsequently stated that it did not intend to preclude appellant's counsel from eliciting testimony concerning the nature of Wiggins' prior felonies and misdemeanors involving moral turpitude. Following the court's clarification, counsel argued that he should not be limited to inquiring about prior felonies and misdemeanors involving moral turpitude, although he stated he would "prefer that middle ground rather than no ground." However, appellant's counsel made no further attempt to elicit testimony concerning Wiggins' prior convictions for felonies and misdemeanors involving moral turpitude. The court also refused counsel's request to elicit testimony on Wiggins' other convictions, viz., his misdemeanors not involving moral turpitude, further stating that counsel had elicited testimony concerning Wiggins' "hope" or "expectation" to receive some consideration for leniency at his forthcoming sentencing.[1]

## II.

Appellant contends that the court erred in limiting his inquiry on cross-examination into the nature of Wiggins' prior criminal convictions. Initially, we note that the trial court did not limit inquiry into the nature of all of Wiggins' prior

---

[1] Appellant proffered Wiggins' criminal record to the trial court. While Wiggins' criminal record appears nowhere in the record on appeal, it is manifest from our reading of the record that Wiggins had been convicted of misdemeanors not involving moral turpitude.

convictions.  Instead, the trial court limited appellant's cross-examination only as it concerned misdemeanors not involving moral turpitude.  Although there was some initial confusion on the issue of appellant's inquiry into the nature of Wiggins' prior convictions for felonies and misdemeanors involving moral turpitude, the trial court made clear that it would allow appellant to make such inquiry.  Appellant's counsel clearly understood the court's clarification, stating that he would "prefer that middle ground rather than no ground."  The issue on appeal, therefore, is limited to the trial court's refusal to allow appellant to cross-examine Wiggins concerning his prior convictions for misdemeanors not involving moral turpitude.

Where the purpose of the inquiry is to impeach a witness' veracity, cross-examination concerning a witness' prior convictions is limited to prior felony convictions and convictions for misdemeanors involving moral turpitude.  See, e.g., Johnson v. Commonwealth, 224 Va. 525, 528, 298 S.E.2d 99, 101 (1982); Chrisman v. Commonwealth, 3 Va. App. 89, 93-100, 348 S.E.2d 399, 401-05 (1986).  However, it is error to apply the principles governing cross-examination for purposes of impeaching a witness' veracity to limit cross-examination designed to demonstrate a witness' bias or motive to testify.  Brown v. Commonwealth, 246 Va. 460, 463-64, 437 S.E.2d 563, 564-65 (1993) ("An accused has a right to cross-examine prosecution witnesses to show bias or motivation and that right, when not abused, is

absolute.  The right emanates from the constitutional right to confront one's accusers."); <u>Whittaker v. Commonwealth</u>, 217 Va. 966, 967, 234 S.E.2d 79, 80 (1977); <u>Fulcher v. Commonwealth</u>, 226 Va. 96, 99, 306 S.E.2d 874, 876 (1983).  We find this to be precisely the error the trial court committed in the present case.

It remains only to determine whether the trial court's error in restricting appellant's right to cross-examination was harmless beyond a reasonable doubt.  <u>Maynard v. Commonwealth</u>, 11 Va. App. 437, 448, 399 S.E.2d 635, 641 (1990) (en banc); <u>Williams v. Commonwealth</u>, 4 Va. App. 53, 78, 354 S.E.2d 79, 93 (1987); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986); <u>see also</u> <u>Lavinder v. Commonwealth</u>, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc) (constitutional error harmless only when reviewing court able to declare belief that it was harmless beyond a reasonable doubt).  "`The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt.'"  <u>Maynard</u>, 11 Va. App. at 448, 399 S.E.2d at 641 (quoting <u>Van Arsdall</u>, 475 U.S. at 684); <u>see also</u> <u>Williams</u>, 4 Va. App. at 78, 354 S.E.2d at 93; <u>Shanklin v. Commonwealth</u>, 222 Va. 862, 864-65, 284 S.E.2d 611, 612-13 (1981).  Thus, to determine whether the trial error was harmless, our analysis turns not on the evidence excluded, <u>viz.</u>, evidence of Wiggins' prior convictions for misdemeanors not involving

moral turpitude, but on the evidence in the record, viz., Wiggins' testimony, which was not fully subject to cross-examination.  See Van Arsdall, 475 U.S. at 684; Maynard, 11 Va. App. at 448, 399 S.E.2d at 641; Williams, 4 Va. App. at 78, 354 S.E.2d at 93; Shanklin, 222 Va. at 864-65, 284 S.E.2d at 612-13.  As such, our harmless error analysis is akin to harmless error review in cases of improperly admitted evidence, where the error is held harmless if the record contains "overwhelming" evidence of guilt.  See Clagett v. Commonwealth, 252 Va. 79, 91, 472 S.E.2d 263, 270 (1996), cert. denied, 117 S. Ct. 972 (1997); Jenkins v. Commonwealth, 244 Va. 445, 454, 423 S.E.2d 360, 366 (1992), cert. denied, 507 U.S. 1036 (1993).  In this case, Wiggins' testimony is the "improper" evidence we evaluate, to determine its effect, if any, on the verdict.

Our analysis of the effect of Wiggins' testimony is guided by specific factors.  In determining whether the trial court's error in limiting appellant's right to cross-examine Wiggins was harmless, we evaluate:

> "the importance of [Wiggins'] testimony in the prosecution's case, whether [Wiggins'] testimony was cumulative, the presence or absence of evidence corroborating or contradicting [Wiggins'] testimony on material points, the extent of
>
> cross-examination [of Wiggins] otherwise
>
> permitted and, of course, the overall
>
> strength of the prosecution's case."

Williams, 4 Va. App. at 78-79, 354 S.E.2d at 93 (quoting Van

Arsdall, 475 U.S. at 684); Maynard, 11 Va. App. at 448, 399 S.E.2d at 641-42.

Based on our review of the record, we conclude beyond a reasonable doubt that the trial court's error was harmless. The overall strength of the Commonwealth's case against appellant is manifest. The facts established by testimony of witnesses other than Wiggins, standing alone, provided overwhelming evidence of appellant's guilt. That evidence established that appellant participated, with malice, in the deadly attack on Ford. Appellant struck Ford repeatedly and held Ford down as Taylor struck him with various objects and eventually strangled him with a belt. In the face of Taylor's stated intention to kill Ford, appellant continued his participation in the attack. Appellant later told his sister, "we just killed a dude." The evidence further established that appellant and Taylor sought to take Ford's money, by force, throughout the attack. After depositing Ford's body, appellant returned with blood-stained money, the same money, it could reasonably be inferred, that Ford had placed in his mouth.

Furthermore, Wiggins' testimony was relatively insignificant to the Commonwealth's case. Compare Shanklin, 222 Va. at 865, 284 S.E.2d at 613 (evidence sufficient to support conviction in absence of witness' testimony), and Fulcher, 226 Va. at 99-100, 306 S.E.2d at 876-77 (same), with Brown, 246 Va. at 465, 437 S.E.2d at 565 (witness' testimony only evidence identifying or

implicating defendant as perpetrator), and Whittaker, 217 Va. at 967, 234 S.E.2d at 80 (same).  Wiggins' testimony was corroborating evidence of appellant's participation in the attack on Ford and the motivation behind the attack.  It did not materially contradict the testimony of the Commonwealth's other witnesses, which alone provided evidence sufficient to support appellant's convictions.[2]

Finally, notwithstanding the trial court's exclusion of misdemeanor offenses not involving moral turpitude as evidence related to Wiggins' bias, it is clear that appellant was afforded the opportunity to cross-examine Wiggins extensively on that very point.  The court allowed appellant to elicit testimony concerning Wiggins' prior convictions for felonies and misdemeanors involving moral turpitude.  The jury was aware of at least ten of Wiggins' prior convictions, seven of which it knew were for felonies.  The jury knew of Wiggins' forthcoming sentencing and knew Wiggins believed that his prior criminal record would likely be relevant to the sentence he received.  The jury was further aware that, in exchange for his testimony, Wiggins hoped, "they [would not give him] the 15 years the

_____

[2] Although only Wiggins' testimony placed an ashtray in appellant's hand, it is immaterial to appellant's conviction for second degree murder whether, acting as a principal in the first degree, appellant struck Ford with an ashtray or whether, acting as a principal in the second degree, he held Ford down while Taylor struck him and eventually strangled him.  Furthermore, contrary to the dissent's suggestion, the extent to which Wiggins' testimony established premeditation is immaterial to appellant's conviction for second degree murder.

– 9 –

charges carry."  In short, the issue of Wiggins' bias and motive to lie was clearly before the jury; the jury knew that Wiggins hoped to avoid a long sentence in his three pending cases and that Wiggins knew the number of his prior convictions, both misdemeanor and felony, could bear on the length of the sentence. Wiggins' bias could have been further underscored and developed only by disclosure of additional criminal conduct that was manifestly of a less serious nature than the conduct of which the jury was aware.

In sum, based on our review of the overwhelming evidence of appellant's participation in the crimes, the cumulative nature of Wiggins' testimony, and the significant opportunity appellant was provided to present evidence concerning Wiggins' bias or motive to testify, we conclude beyond a reasonable doubt that any error in refusing to allow cross-examination with respect to Wiggins' prior convictions for misdemeanors not involving moral turpitude was harmless.

Accordingly, appellant's convictions are affirmed.

<u>Affirmed.</u>

Benton, J., dissenting.

The trial judge erred in limiting Tyrone Scott's counsel's cross-examination of Linwood Wiggins, the inmate who testified for the Commonwealth. The questioning related to Wiggins' bias and, thus, tended to undermine his credibility.

> An accused has a right to cross-examine prosecution witnesses to show bias or motivation and that right, when not abused, is absolute. The right emanates from the constitutional right to confront one's accusers.

Brown v. Commonwealth, 246 Va. 460, 464, 437 S.E.2d 563, 564-65 (1993).

The majority holds that the trial judge's error was harmless. I disagree. The rule is well established that "'[a] fair trial on the merits and substantial justice' are not achieved if an error at trial has affected the verdict." Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc) (quoting Code § 8.01-678). Thus, "a harmless error analysis . . . [is not] simply a sufficiency of the evidence analysis." Hooker v. Commonwealth, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992). Even if "the other evidence amply supports the jury's verdicts, [error is not harmless when] the disputed testimony may well have affected the jury's decision." Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978).

Both Zenobia Jones and Tamika Young testified for the Commonwealth concerning the events that occurred in Jones' house.

Both testified that Jones, Young, Kimberly Taylor, Tyrone Scott, and the victim had spent most of the day drinking beer and using both cocaine and heroin. Young testified that in the evening she and the victim went upstairs, disrobed, and began to engage in sexual touching. When the victim refused to pay Young for sexual acts, Taylor entered the room and attempted to force the victim to pay Young. Young testified that Taylor and the victim began to fight. During the fighting, the victim hit Young and pushed her to the floor. After Young was pushed to the floor, she called Scott to stop the fighting. The testimony of the events that then followed was in conflict.

Young testified that Scott came upstairs and only became involved in the dispute after the victim hit Young. Young testified that Scott asked the victim to give Young the money he owed her. Young testified that after Scott spoke to the victim, the victim and Scott started fighting. The fighting moved from the bedroom to a room downstairs. Young testified that Taylor hit the victim while Scott held him. She also testified that Taylor stabbed the victim and strangled him.

Jones testified that sometime after 8:00 p.m. Taylor, Young, Scott, and the victim were "shoving amongst themselves." Jones said that she ordered them to leave her house. All of them walked down the stairs. Jones testified that after she ordered all of them to leave her house she saw Scott holding the victim and did not know "whether [Scott] was helping him or steadying

him."  She testified that she did not see Scott hit the victim.
However, as Jones opened the door, Taylor became aggressive and
began hitting the victim with an object.  Young testified that
Taylor hit the victim with a glass object and strangled him.

Wiggins, the prison inmate who was not present at the house,
testified that Scott said he hit the victim with an ashtray.
Wiggins also testified that Scott said he got involved in the
dispute because the victim had a thousand dollars.

Scott testified that he only hit the victim to defend
himself when the victim became belligerent.  Both Young and
Taylor testified that Scott asked Taylor to stop assaulting the
victim.  Indeed, Scott's testimony that he only hit the victim in
self-defense is not inconsistent with the testimony of Jones and
Young.

The testimony concerning Scott's participation was
conflicting.  Although Wiggins testified that Scott admitted
hitting the victim with an ashtray, both Young and Jones
testified that Taylor, not Scott, hit the victim with an object.
 Young also testified that Taylor stabbed the victim with an
object.  Neither Jones nor Young testified that Scott hit the
victim with any object.  Thus, the jury was required to resolve
four different versions of the events from the testimony of the
three people who were in the house -- Jones, Young, and Scott --
and Wiggins, who was not present.

Wiggins' testimony was offered by the Commonwealth to fill

substantial gaps in its case and to support the inferences the jury was required to draw to convict Scott.  Indeed, only Wiggins' testimony, if believed, proved that Scott hit the victim with an ashtray and tended to prove that Scott took money from the victim.  Thus, on one hand, if the jury believed Wiggins, the jury could have reached the same verdicts based solely on his testimony (i.e., even if the jury disbelieved the testimony of Young, Jones, and Scott).  On the other hand, if the jury had disbelieved Wiggins' testimony, the jury would have had no evidence to support a finding that Scott hit the victim with any object and could only speculate that Scott took money from the victim or that any money was even taken from the victim.  Moreover, Wiggins' testimony was the only evidence that directly contradicted Scott's assertion that he acted in self-defense.  Thus, Wiggins' credibility was critically important.

In finding the error harmless, the majority posits that other witnesses proved facts in dispute.  However, that "[o]ther evidence of a disputed fact [exists in the record] . . . does not establish that an error is harmless."  Hooker, 14 Va. App. at 458, 418 S.E.2d at 345.  It is well settled that the credibility of witnesses, the weight accorded witnesses' testimony, and the inferences to be drawn from proven facts are matters that are within the province of the fact finder.  See Barrett v. Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986).  When the trial judge errs in limiting a defendant's cross-examination

of a witness on a matter that bears on credibility, that error cannot be harmless where the determination of the sufficiency of proof involves the jury's assessment of that witness' credibility.  See Waller v. Commonwealth, 22 Va. App. 53, 61, 467 S.E.2d 844, 848 (1996).  Because the jury could have founded its verdicts on Wiggins' testimony, the trial judge's limitation of Scott's counsel's examination of Wiggins for bias cannot be harmless.

Wiggins' testimony was the only evidence that tended to prove Scott premeditated the killing and hit the victim with an object to take his money.  His testimony was the strongest evidence tending to prove Scott acted with malice.  Most importantly, Wiggins was the only witness whose testimony directly contradicted Scott's testimony.  Thus, it cannot be said, as the majority asserts, that Wiggins' testimony was merely cumulative.

The majority concludes that the evidence would have had little impact because "the issue of Wiggins' bias and motive to lie was [already] . . . before the jury" and the crimes excluded were less serious than the crimes admitted.  Even assuming that the jury would have only slightly further discounted Wiggins' testimony, the effect on the verdict -- the relevant harmless error issue -- may have been significant.  Wiggins' testimony was critical to the prosecution and extremely damaging to Scott's defense.  Even the slightest further diminution of Wiggins'

credibility may have had a significant impact on the verdict. As the Supreme Court stated in Brown:

> We do not accept the Commonwealth's suggestion that any error was harmless. [The witness'] testimony was the only evidence directly identifying [the accused] as the perpetrator of the murder. It is true that the Commonwealth presented certain circumstantial evidence that implicated [the accused], but this evidence alone may not have been sufficient to support the conviction.

246 Va. at 465, 437 S.E.2d at 565.

Scott testified that he was merely defending himself. His testimony was not inconsistent with the testimony of Jones and Young, the Commonwealth's witnesses. Indeed, upon the evidence proved at trial, the trial judge instructed the jury that it could render a verdict of manslaughter, a killing committed without premeditation or malice. Moreover, based on the verdict of second degree murder, the conclusion is inescapable that the jury disbelieved Wiggins' testimony to the extent that it was offered to prove premeditation. Thus, had Scott's counsel been permitted to develop fully Wiggins' possible bias, the jury may have further discounted Wiggins' testimony and rendered a verdict of manslaughter.

The majority states that "the extent to which Wiggins' testimony established premeditation is immaterial to [Scott's] conviction for second degree murder." That assertion ignores the harmless error inquiry -- whether the error may have affected the verdict. See Cartera, 219 Va. at 519, 248 S.E.2d at 786.

- 16 -

Wiggins' testimony was the only evidence that tended to prove Scott possessed the most blameworthy state of mind -- premeditating a malicious killing.  Because Wiggins' testimony was extremely prejudicial as to malice, it cannot be said that the error did not affect the verdict simply because the jury did not convict for first degree murder.  Wiggins' testimony may have caused the jury to find second decree murder instead of finding manslaughter or acquitting Scott.

Obviously, from the record in this case "[w]e cannot say beyond a reasonable doubt that, if the jury had believed [Wiggins'] testimony was unreliable, the[] verdict would have been the same."  Whittaker v. Commonwealth, 217 Va. 966, 970, 234 S.E.2d 79, 82 (1977).  We cannot say that if the evidence relating to Wiggins' bias had been thoroughly explored, the jury nevertheless would have credited his testimony as proof of malice and returned the same verdict.  See id.  That is, we cannot exclude the possibility that, had Wiggins' bias been further revealed, the jury would have returned a verdict of voluntary manslaughter or not guilty.

- 17 -